# Exhibit A

Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN SIMUTIS, derivatively on behalf of ULTRAGENYX PHARMACEUTICAL INC., <br><br> Plaintiff, <br><br> v. <br><br> EMIL D. KAKKIS, ERIC CROMBEZ, DEBORAH DUNSIRE, MATTHEW K. FUST, MICHAEL NARACHI, AMRIT RAY, CORSEE D. SANDERS, SHEHNAAZ SULIMAN, and DANIEL G. WELCH, <br><br> Defendants, <br><br> and <br><br> ULTRAGENYX PHARMACEUTICAL INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> **<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>** |

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Ryan Simutis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Ultragenyx Pharmaceutical Inc. ("Ultragenyx" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Emil D. Kakkis ("Kakkis"), Eric Crombez ("Crombez"), Deborah Dunsire ("Dunsire"), Matthew K. Fust ("Fust"), Michael Narachi ("Narachi"), Amrit Ray ("Ray"), Corsee D. Sanders ("Sanders"), Shehnaaz Suliman ("Suliman"), and Daniel G. Welch ("Welch") (collectively, the "Individual Defendants," and together with Ultragenyx, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Ultragenyx, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Kakkis and Crombez for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ultragenyx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 3, 2023 through December 26, 2025, both dates inclusive (the "Relevant Period").

2. Ultragenyx is a biopharmaceutical company incorporated in Delaware and headquartered in Novato, California. The Company focuses on developing therapies and products for the treatment of serious rare and ultrarare genetic diseases.

3. In October 2023, the Company announced its plans for the Phase III Orbit and Cosmic studies (collectively, the "Phase III OI Studies"), which tested the efficacy of its clinical product candidate, UX143, also known as setrusumab, in patients with Osteogenesis Imperfecta ("OI"). Specifically, the Phase III OI Studies tested setrusumab's ability to decrease the annualized fracture rate in patients with OI types 1, 3, and 4. By April 2024, the enrollment of patients for each study was completed and the Phase III OI Studies were underway.

4. Throughout the Relevant Period, the Individual Defendants not only touted the potential of setrusumab but also assured investors of their confidence in its efficacy. In effect, the Individual Defendant's overstated setrusumab's ability to trigger a decrease in the annualized fracture rate of OI patients.

5. However, the results of the Phase III OI Studies were unable to support the Individual Defendants' confidence. On July 9, 2025, the Company issued a press release that disclosed the results of the second interim analysis of the Phase III Orbit study. The results disclosed that the Phase III Orbit study failed to achieve statistical significance and that both the Phase III OI Studies would be moving toward a third and final analysis in the hopes to achieve its primary endpoints.

6. On this news, the price of Company stock declined $10.41 or 25.1%, from a closing price of $41.44 per share on July 9, 2025, to a closing price of $31.03 per share on July 10, 2025.

Verified Shareholder Derivative Complaint

7. Despite this, the Individual Defendants continued to make false and misleading statements. In particular, the Individual Defendants created the false impression, and misled the investing public to believe, that the Phase III OI Studies would achieve successful results in its final analysis.

8. The truth fully emerged on December 29, 2025, when the Company announced that the Phase III OI Studies had not achieved their primary endpoints. Specifically, the Company claimed the results were due to a "low fracture rate in the placebo group" in the Orbit study and a trend falling shy of statistical significance in the Cosmic study.

9. On this news, the Company's common stock dropped $14.47 or 42.3%, from a closing price of $34.19 on December 26, 2025, to a closing price of $19.72 per share on December 29, 2025.

10. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

11. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially

4

Verified Shareholder Derivative Complaint

inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $9.1 million.

12. In light of the Individual Defendants' misconduct—which has subjected the Company, its Founder, President, and Chief Executive Officer ("CEO") and its Executive Vice President ("EVP) and Chief Medical Officer ("CMO") in a federal securities class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Kakkis' and Crombez's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims

Verified Shareholder Derivative Complaint

made in the Securities Class Action based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Ultragenyx. Plaintiff has continuously held Ultragenyx common stock at all relevant times.

### Nominal Defendant Ultragenyx

20. Ultragenyx is a Delaware corporation with principal executive offices located at 60 Leveroni Court, Novato, California 94949. Ultragenyx's common stock trades on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "RARE."

### Defendant Kakkis

21. Defendant Kakkis has is the Company's founder and has served as the Company's President and CEO since the Company's inception in April 2010. Defendant Kakkis also serves on the Board's Research and Development Committee.

22. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kakkis made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
| --- | --- | --- | --- |

6

Verified Shareholder Derivative Complaint

| October 19, 2023 | 47,853 | $33.52 | $1,604,033 |
|---|---|---|---|
| December 29, 2023 | 30,000 | $47.87 | $1,436,100 |
| February 7, 2024 | 30,000 | $45 | $1,350,000 |
| March 1, 2024 | 17,417 | $53.69 | $935,119 |
| March 3, 2025 | 73,434 | $42.10 | $3,091,571 |

Thus, in total, before the fraud was exposed, Defendant Kakkis sold 198,704 shares of Company stock on inside information, for which he received approximately $8.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23. The Schedule 14A the Company filed with the SEC on March 28, 2025 (the "2025 Proxy Statement") stated the following about Defendant Kakkis:

*Dr. Kakkis* is our founder and has served as our President and Chief Executive Officer and as a member of our Board since our inception in April 2010. Dr. Kakkis served as our interim principal financial officer following the departure of the Company's Chief Financial Officer in November 2022 until the appointment of Mr. Horn as the Company's Chief Financial Officer in October 2023. Prior to Ultragenyx, from September 1998 to February 2009, Dr. Kakkis served in various executive capacities, and ultimately as Chief Medical Officer, at BioMarin Pharmaceutical Inc., a biopharmaceutical company. Dr. Kakkis then served as a development consultant to BioMarin from 2009 to 2010. Dr. Kakkis is also Founder of EveryLife Foundation for Rare Diseases, a non-profit organization he started in 2009 to accelerate biotechnology innovation for rare diseases. Dr. Kakkis received the Termeer Visionary Leadership Award in 2019 and the Leadership Award from the California Life Sciences Association in 2021. Dr. Kakkis is board certified in Medical Genetics and was board certified in Pediatrics. He holds a B.A. in Biology from Pomona College and combined M.D. and Ph.D. degrees from the UCLA School of Medicine's Medical Scientist Training Program where he received the Bogen prize for his research.

\*\*\*

7

Verified Shareholder Derivative Complaint

We believe that Dr. Kakkis possesses specific expert knowledge of genetics and rare diseases and operational experience in the life sciences sector that qualify him to serve on our Board.

**Defendant Crombez**

24. Defendant Crombez has served as the Company's Executive Vice President and CMO since November 2017.

25. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Crombez made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| March 1, 2024 | 1,238 | $53.76 | $66,555 |
| April 18, 2024 | 142 | $44.10 | $6,262 |
| May 2, 2024 | 354 | $43.66 | $15,456 |
| March 3, 2025 | 8,945 | $42.10 | $376,585 |
| May 5, 2025 | 520 | $39.24 | $20,405 |

Thus, in total, before the fraud was exposed, Defendant Crombez sold 11,199 shares of Company stock on inside information, for which he received approximately $485,262 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26. The 2025 Proxy Statement stated the following about Defendant Crombez:

***Dr. Eric Crombez*** has served as our Chief Medical Officer, Executive Vice President since March 2023. Dr. Crombez previously served as our Chief Medical Officer for gene therapy and inborn errors of metabolism, overseeing global clinical development and execution for the Company's gene therapy programs, after he joined the Company following the acquisition of Dimension Therapeutics, a biotechnology company, in November 2017. At Dimension Therapeutics, Dr. Crombez served as Chief Medical Officer from December 2014 to November 2017 where he led the clinical development efforts for clinical gene therapy programs in hemophilia B, hemophilia A, ornithine transcarbamylase (OTC) deficiency and glycogen storage disease

Verified Shareholder Derivative Complaint

type Ia (GSDIa). Previously, he worked at Shire plc, a biopharmaceutical company, in its Human Genetics Therapy business unit. Dr. Crombez is an appointed industry representative on the FDA Cellular, Tissue and Gene Therapies Advisory Committee. He previously served as assistant professor, Department of Pediatrics, Division of Medical Genetics at the David Geffen School of Medicine at the University of California, Los Angeles (UCLA). Dr. Crombez currently serves on the board of directors of Abeona Therapeutics Inc., a publicly traded biopharmaceutical company. Dr. Crombez is a board-certified clinical geneticist and completed residencies in pediatrics and medical genetics and a fellowship in clinical biochemical genetics at the UCLA School of Medicine. Dr. Crombez obtained his B.S. in biology from the University of Michigan, Ann Arbor, and his M.D. from Wayne State University School of Medicine, Detroit.

### Defendant Welch

27. Defendant Welch has served as a Company director since April 2015. He also serves on the Compensation Committee and the Nominating and Corporate Governance Committee.

28. The 2025 Proxy Statement stated the following about Defendant Welch:

*Mr. Welch* is a board member and advisor to life science companies. Mr. Welch currently serves as chairman on the boards of Structure Therapeutics, Inc. and Prothena Corporation plc, each a publicly traded biotechnology company. Between January 2015 and January 2018, he was an Executive Partner at Sofinnova Ventures, a venture capital firm. Prior to Sofinnova, Mr. Welch served as Chairman, Chief Executive Officer, and President of InterMune, Inc., a biotechnology company, from May 2008 to October 2014 and served as President and Chief Executive Officer of InterMune and a member of its board of directors from September 2003 to May 2008. From August 2002 to January 2003, Mr. Welch served as Chairman and Chief Executive Officer of Triangle Pharmaceuticals, Inc., a pharmaceutical company. From October 2000 to June 2002, Mr. Welch served as President of the pharmaceutical division of Elan Corporation, plc. Mr. Welch previously served as chairman of the board of directors of Nuvation Bio from July 2020 to September 2024 and as a director on the boards of directors of Intercept Pharmaceuticals, Inc from November 2015 to June 2021 and Seagen Inc. from July 2007 to December 2023. Mr. Welch holds a B.S. from the University of Miami and an M.B.A. from the University of North Carolina.

9

Verified Shareholder Derivative Complaint

***

We believe that Mr. Welch is a strong operating executive with operational and strategic expertise in the global pharmaceutical market, whose experience contributes valuable insight to the Board.

## Defendant Dunsire

29.     Defendant Dunsire has served as a Company director since April 2017. Defendant Dunsire also serves on the Compensation Committee and the Research and Development Committee.

30.     The 2025 Proxy Statement stated the following about Defendant Dunsire:

*Dr. Dunsire* is a board member and advisor to life science companies. Dr. Dunsire served as President and Chief Executive Officer of H. Lundbeck A/S, a pharmaceutical company, from September 2018 until August 2023. She previously served as President and Chief Executive Officer and as a director of Xtuit Pharmaceuticals, Inc., a private biopharmaceutical company, from January 2017 to March 2018. Prior to her position at Xtuit, she served as President and Chief Executive Officer and a director of FORUM Pharmaceuticals Inc., a private pharmaceutical company, from July 2013 to May 2016. Prior to FORUM, Dr. Dunsire worked for Takeda Pharmaceutical Company Limited, a publicly traded pharmaceutical company, as a corporate officer from June 2010 to June 2011 and a director from June 2011 to June 2013. She served as President and Chief Executive Officer and as a director of Millennium Pharmaceuticals, Inc., a publicly traded biopharmaceutical company, between 2005 and 2008, when it was acquired by Takeda, and then as President and Chief Executive Officer of Millennium: The Takeda Oncology Company after the acquisition between 2008 and 2013. Prior to Millennium, Dr. Dunsire held various roles of increasing responsibility at Novartis Pharma AG between 1988 and 2005. Dr. Dunsire currently serves on the board of McKesson Corporation, a publicly traded healthcare services company. She previously served on the board of directors of Syros Pharmaceuticals, a publicly traded biotech company, from September 2021 to November 2024 and of Alexion Pharmaceuticals Inc., a publicly traded biotech company, from January 2018 until July 2021 when it was acquired by AstraZeneca. She obtained an MBBCh from the University of the Witwatersrand.

***

We believe that Dr. Dunsire is qualified to serve on our Board due to her

10

Verified Shareholder Derivative Complaint

extensive experience in the biotechnology and pharmaceutical sectors, including service as the chief executive officer of various pharmaceutical companies, which gives her the skills to provide us with operational and strategic insights.

### Defendant Fust

31. Defendant Fust has served as a Company director since January 2014. He also serves on the Nominating Committee and as chair of the Audit Committee.

32. The 2025 Proxy Statement stated the following about Defendant Fust:

*Mr. Fust* is a board member and advisor to life science companies. Mr. Fust currently serves on the board of directors of Atara Biotherapeutics, Inc., Crinetics Pharmaceuticals, Inc. and Neumora Therapeutics Inc., all of which are publicly traded biopharmaceutical companies. Mr. Fust also previously served on the board of directors of Dermira, Inc., a biopharmaceutical company, from August 2014 to February 2020 and the board of MacroGenics, Inc., a biotechnology company, from March 2014 to May 2020. He retired as Executive Vice President of Onyx Pharmaceuticals, Inc., a biopharmaceutical company, where he served from January 2009 to January 2014. From May 2003 to December 2008, Mr. Fust served as Chief Financial Officer at Jazz Pharmaceuticals, Inc., a specialty pharmaceutical company. From 2002 to 2003, Mr. Fust served as Chief Financial Officer at Perlegen Sciences, Inc., a biopharmaceutical company. Previously, he was Senior Vice President and Chief Financial Officer at ALZA Corporation, a pharmaceutical company, where he was an executive from 1996 to 2002. From 1991 to 1996, Mr. Fust was a manager in the healthcare strategy practice at Andersen Consulting, a consulting company. Mr. Fust holds a B.A. in Accounting from the University of Minnesota and an M.B.A. from the Stanford Graduate School of Business.

***

We believe that Mr. Fust is qualified to serve on our Board due to his extensive experience in the life sciences industry, his financial experience and ability to be our "audit committee financial expert," and his service as a director of other public biopharmaceutical companies.

### Defendant Narachi

33. Defendant Narachi has served as a Company director since February 2015. He also serves on the Audit Committee and the Compensation Committee.

34. The 2025 Proxy Statement stated the following about Defendant Narachi:

Verified Shareholder Derivative Complaint

**Mr. Narachi** previously served as President and Chief Executive Officer of CODA Biotherapeutics, Inc., a private biotherapeutics company, from August 2018 through October 2022 and served as a director of CODA Biotherapeutics until the company's sale in March 2023. Between March 2009 and July 2018, Mr. Narachi served as President, Chief Executive Officer and director of Orexigen Therapeutics, Inc., a biotechnology company. Orexigen filed for reorganization under Chapter 11 of the U.S. Bankruptcy Code in March 2018. Previously, Mr. Narachi served as Chairman, Chief Executive Officer, and President of Ren Pharmaceuticals, Inc., a private biotechnology company, from November 2006 to March 2009. In 2004, Mr. Narachi retired as Vice President of Amgen Inc., a leading therapeutics company, where he served as General Manager of Amgen's Anemia Business from 1999 to 2003, until his retirement in 2004. Mr. Narachi joined Amgen in 1984 and held various senior positions throughout the organization over a 20-year career including global development leader for Neupogen/Neulasta, Vice President of development and representative director for Amgen Japan; head of corporate strategic planning; Chief Operations Officer of Amgen Colorado; and vice president, licensing and business development. Mr. Narachi previously served on the board of directors of BIO, the Biotechnology Innovation Organization, as a member of the board of directors of PhRMA, the Pharmaceutical Research and Manufacturers of America, and as the chairman of the board of directors of Celladon Corporation, a publicly traded gene therapy company, from October 2013 to March 2016, and as a director of AMAG Pharmaceuticals, Inc., a publicly traded specialty pharmaceutical company, from November 2006 to April 2014. Mr. Narachi holds a B. S. in Biology and an M. A. in Biology and Genetics from the University of California, Davis. He also holds an M.B.A. from the Anderson Graduate School of Management at the University of California, Los Angeles.

\*\*\*

We believe that Mr. Narachi is qualified to serve on our Board due to his extensive experience in the life sciences industry, his service as the chief executive officer of various biotechnology companies, and his membership on various boards of directors in the biotechnology and pharmaceutical sectors, all of which give him the skills to provide us with operational and strategic insights.

**Defendant Ray**

35. Defendant Ray has served as a Company director since April 2022. He also

Verified Shareholder Derivative Complaint

serves as chair of the Research and Development Committee.

36.     The 2025 Proxy Statement stated the following about Defendant Ray:

**Dr. Ray** is a board member and advisor to life science companies. Dr. Ray currently serves on the board of directors of Fortrea Holdings Inc., a publicly traded, global clinical research organization, and on the board of directors of several privately owned life science companies. Previously, Dr. Ray served as Chief Patient Officer at Biohaven Ltd. a public biopharmaceutical company, from March 2022 to December 2022 when acquired by Pfizer. Prior to his role at Biohaven, he served as Senior Adviser to Bain Capital Life Sciences, an investment company, from February 2021 to March 2022. Prior to Bain Capital, Dr. Ray served as Global President, Head of R&D and Medical, for Pfizer Essential Health and subsequently the Pfizer Upjohn division at Pfizer, Inc., a public pharmaceutical company, from 2017 to January 2021. Prior to Pfizer, he held positions of increasing responsibility at Johnson & Johnson, a public pharmaceutical company, including serving as Senior Vice President, External Affairs (Science and Medicine) in 2017, Senior Vice President, Chief Medical Officer of Janssen from 2012 to 2017 and Senior Vice President, Chief Safety Officer from 2009 to 2012. Dr. Ray currently serves as a Trustee at the Board of the Hastings Center for Bioethics, and as a Visiting Professor of Practice, Faculty of Medical Sciences at Newcastle University in the United Kingdom. Dr. Ray holds a B.S., with Honours, in Immunology and a M.D. (M.B., Ch.B.) from the University of Edinburgh. He also holds an M.B.A. from the Tuck School of Business at Dartmouth College.

***

We believe that Dr. Ray is qualified to serve on our Board due to his extensive experience in the life sciences industry, and particularly his research and development expertise.

**Defendant Sanders**

37.     Defendant Sanders has served as a Company director since June 2021. She also serves on the Audit Committee and the Research and Development Committee.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sanders made the following sales of Company common stock:

13

Verified Shareholder Derivative Complaint

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| June 10, 2024 | 1,737 | $41.10 | $71,391 |
| July 2, 2024 | 584 | $40.98 | $23,932 |
| June 20, 2025 | 2,405 | $37.39 | $89,923 |

Thus, in total, before the fraud was exposed, Defendant Sanders sold 4,726 shares of Company stock on inside information, for which she received approximately $185,246 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

39. The 2025 Proxy Statement stated the following about Defendant Sanders:

**Dr. Sanders** is a board member and advisor to life science companies. Dr. Sanders currently serves as a member of the board of directors of Beigene Ltd., Molecular Templates Inc. and Legend Biotech Corporation, each a publicly traded biotechnology company. She currently serves as a co-chair of the Board of Advisors, and Chair of the Science and Technology Advisory Committee for the Fred Hutchinson Cancer Center. She most recently served as Executive Vice President at Juno Therapeutics, Inc., a biopharmaceutical company, from 2017 to 2018 and strategic advisor to the Chief Medical Officer of Celgene Corporation, a biopharmaceutical company, from 2018 to 2019 following Juno's acquisition by Celgene. Following the acquisition of Celgene by Bristol Myers Squibb, Dr. Sanders served as Transition Advisor to the Clinical Development team at BMS from 2019 to 2020. Prior to her role at BMS, she held positions of increasing responsibility at Genentech/Roche, a biotechnology company, from 1994 to 2017, including serving as Senior Vice President, Global Head of Clinical Operations and Industry Collaboration, from 2012 to 2017. Dr. Sanders holds a B.S. and M.S. in Statistics, magna cum laude, from the University of the Philippines. She also holds an M.A. and Ph.D. in Statistics from the Wharton Doctoral Program at the University of Pennsylvania.

***

We believe that Dr. Sanders is qualified to serve on our Board due to her established and extensive experience in global clinical development and her role as an advisor and director to various companies in the biotechnology and pharmaceutical sectors, all of which give her the skills to provide us with

14

Verified Shareholder Derivative Complaint

operational and strategic insights.

**Defendant Suliman**

40. Defendant Suliman served as a Company Director since February 2019. She also serves on the Research and Development Committee and as chair of the Nominating and Corporate Governance Committee.

41. The 2025 Proxy Statement stated the following about Defendant Suliman:

*Dr. Suliman* has served as Chief Executive Officer of ReCode Therapeutics, a privately-held, integrated genetic medicines company, since January 2022. Prior to joining ReCode Therapeutics, Dr. Suliman served as President and Chief Operating Officer of Alector, Inc., a clinical stage biotechnology company, from December 2019 to December 2021 and previously served as Senior Vice President, Corporate Development and Strategy of Theravance Biopharma, Inc., a biopharmaceutical company, from July 2017 to March 2019. Prior to her position at Theravance, Dr. Suliman worked for Genentech, Inc., a biopharmaceutical company, as Group Leader and Project Team Leader in the R&D Portfolio Management and Operations Group from September 2010 to May 2015 and then as Vice President and Global Therapeutic Head, Roche Partnering from June 2015 to July 2017. Prior to Genentech, Dr. Suliman held various management roles of increasing responsibility at Gilead Sciences, Inc., a biopharmaceutical company, from January 2005 and September 2010. Prior to Gilead, Dr. Suliman was an investment banker with Lehman Brothers and Petkevich & Partners, advising public and private companies on buy- and sell-side transactions. She is a member of the board of directors of 10X Genomics, Inc., a publicly traded life science technology company. Dr. Suliman received her M.D. at the University of Cape Town Medical School, South Africa, and holds an M.B.A, with distinction, and M.Phil. in Development Studies from Oxford University, where she was a Rhodes Scholar.

\*\*\*

We believe that Dr. Suliman is qualified to serve on our Board due to her extensive operational experience with global biopharmaceutical companies, and particularly her expertise in business development, corporate strategy and clinical drug development.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

15

Verified Shareholder Derivative Complaint

42. By reason of their positions as officers, directors, and/or fiduciaries of Ultragenyx and because of their ability to control the business and corporate affairs of Ultragenyx, the Individual Defendants owed Ultragenyx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ultragenyx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ultragenyx and its shareholders so as to benefit all shareholders equally.

43. Each director and officer of the Company owes to Ultragenyx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ultragenyx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45. To discharge their duties, the officers and directors of Ultragenyx were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Ultragenyx, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been

ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

47. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

48. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ultragenyx were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Ultragenyx's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Ultragenyx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to

17

Verified Shareholder Derivative Complaint

make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Ultragenyx and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ultragenyx's operations would comply with all applicable laws and Ultragenyx's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.     Each of the Individual Defendants further owed to Ultragenyx and the shareholders the duty of loyalty requiring that each favor Ultragenyx's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Ultragenyx and were at all times acting within the course and scope of such

18

Verified Shareholder Derivative Complaint

agency.

51.     Because of their advisory, executive, managerial, directorial, and controlling positions with Ultragenyx, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

52.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ultragenyx.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

53.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

54.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

Verified Shareholder Derivative Complaint

Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ultragenyx was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ultragenyx and was at all times acting within the course and scope of such agency.

## ULTRAGENYX'S CODE OF CONDUCT

58. Ultragenyx's Global Code of Conduct (the "Code of Conduct") states that it "applies globally all employees, officers, and directors regardless of position or tenure."

59. In a section titled "Comprehensive Compliance Program," the Code of Conduct states:

The Program complies with laws and principles applicable to our industry and includes, but is not limited to:

- Written standards of conduct, policies, and procedures;

- Training and education programs for all employees;

- Open lines of communication between the Legal Department and employees, including a process to receive anonymous complaints and concerns;

- Oversight, auditing and monitoring program to identify and address

Verified Shareholder Derivative Complaint

risk; and

- Enforcement of compliance obligations, including disciplinary action for noncompliance.

60. In the section "Engaging with the Public," and under the subsection "Public Company Disclosure Obligations," the Code of Conduct states that the Company's "internal control procedures are further regulated by the Sarbanes-Oxley Act of 2002 . . .."

61. In the same section and subsection, the Code of Conduct further adds:

Ensuring proper and effective internal controls is among Ultragenyx's highest priorities.

We take seriously the reliance our investors place on us to provide accurate and timely information about our business. In support of our disclosure obligations, it is our policy to always:

- Comply with generally accepted accounting principles;

- Maintain a system of internal accounting and disclosure controls and procedures that provides management with reasonable assurances that transactions are properly recorded and that material information is made known to management;

- Maintain books and records that accurately and fairly reflect transactions; and

- Prohibit establishment of material undisclosed or unrecorded funds or assets.

62. In the section "Protecting Our Company," under the subsection "Accurate Business Records, the Code of Conduct states, in relevant part:

We are committed to maintaining accurate business records and accounts in order to ensure legal and ethical business practices and to prevent fraudulent activities.

Investors rely on us to provide accurate information on which they can make good decisions.

You are responsible for:

21

Verified Shareholder Derivative Complaint

1. Reporting accurate, complete and understandable information about our business, earnings, and financial condition;

2. Maintaining records and communications in the normal course of business and pursuant to Company policy;

3. Cooperating fully with outside accountants in connection with any audit or review of our Company's financial statements;

4. Coming forward if you feel that you are being pressured to prepare, alter, conceal or destroy documents in violation of our Company policy or any statutory document retention requirement; and

5. Reporting to the Company using the resources listed in Raising Concerns if you have any reason to believe that someone has made a misleading, incomplete, or false statement to an accountant, auditor, attorney or government official in connection with any investigation, audit, examination or filing with any government agency or regulatory body. We do not tolerate retaliation against those who raise concerns in good faith or those who participate in an investigation relating to such a complaint.

63. In the section "Engaging with the Public," under the subsection "Insider Trading," the Code of Conduct states, in relevant part:

It is against both the law and Company policy to either buy or sell securities (e.g., stocks, bonds, or options) while aware of material non-public information, or pass such information along to others who use it to buy or sell securities (known as "tipping"). This includes the trading of both Company stock and the securities of any other company. We have also adopted certain procedures that apply to members of our board of directors, executive officers, and certain designated employees and consultants of the Company and its subsidiaries who regularly have access to material non-public information about the Company. We make it a priority to help prevent inadvertent violations of the federal securities laws and to avoid even the appearance of trading on the basis of material, non-public information.

64. Under the section titled "Doing the Right Thing," under the subsection "Personal Resposniblity," the Code of Conduct states, in relevant part:

Any waiver of this Code of Conduct for any officer or director requires the

22

Verified Shareholder Derivative Complaint

written approval of the Company's Board of Directors. Any waiver as well as the reasons for the waiver shall be disclosed promptly to the Company's shareholders.

65. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting combined total proceeds of approximately $9.1 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## ULTRAGENYX'S AUDIT COMMITTEE CHARTER

66. According to Ultragenyx's Audit Committee Charter, the Audit Committee was established for the purpose of:

(a) overseeing the accounting and financial reporting process of the Company and the audits of the financial statements of the Company;

(b) appointing and retaining (subject to ratification by the Company's stockholders), compensating, overseeing, evaluating and replacing, if necessary, the Company's independent registered public accounting firm (the "independent auditor");

(c) assisting the Board in overseeing:

(i) the integrity of the Company's financial statements,

(ii) the integrity of the accounting and financial reporting processes of the Company,

(iii) the Company's compliance with legal and regulatory requirements

(iv) the performance of the Company's independent auditor and internal

Verified Shareholder Derivative Complaint

audit function, if any; and

(d)  overseeing the preparation of the report of the Committee that the Securities and Exchange Commission (the "SEC") requires to be included in the Company's annual proxy statement.

67.  The Company's Audit Committee Charter states that the Audit Committee has the following responsibilities, among others:

Accounting Reviews and Reports.

(a) Review and discuss with management and the independent auditor the Company's annual financial statements, quarterly financial statements and "Management's Discussion and Analysis of Financial Conditions and Results of Operations" (the "MD&A") of the Company prior to the filing of the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q.  Discuss results of the annual audit and quarterly review and any other matters required to be communicated to the Committee by the independent auditor under standards established by the Public Company Accounting Oversight Board (the "PCAOB"). Review other relevant reports or financial information submitted by the Company to any governmental body or the public and relevant reports rendered by the independent auditor (or summaries thereof).

(b) Discuss with management its process for performing its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act of 2002, including the evaluation of the effectiveness of disclosure controls by the Chief Executive Officer and Chief Financial Officer.

(c)  Discuss with management and the independent auditor their judgment about the quality of accounting principles, the reasonableness of significant judgments, including a description of any transactions as to which the management obtained a Statement of Auditing Standards No. 50 letter, and the clarity of the disclosures in the financial statements, including the Company's disclosures of critical accounting policies and other disclosures under the MD&A.

(d) Discuss with management, and as applicable, the independent auditor, the Company's disclosure controls and procedures over environmental and sustainability reporting data and disclosures, and any assurance being provided by the independent auditor (or other third parties), with respect to such data and disclosures.

(e)  Recommend to the Board, based in particular on the Committee's reviews and discussions described in paragraphs 3.1(a) and 3.2(b), (f) and

24

Verified Shareholder Derivative Complaint

(g), whether the financial statements should be included in the Company's annual report.

(f) Prepare the audit committee report for inclusion in the Company's annual proxy statement as required by the rules of the SEC.

(g) Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

68. With respect to internal controls, the Audit Committee Charter states that the Audit Committee has the following responsibilities, among others;

Review of Internal Controls.

(a) Discuss and review the effect of regulatory and accounting initiatives, alternative GAAP methods and off-balance-sheet structures on the financial statements of the Company.

(b) Review significant changes in accounting or auditing practices, principles or policies.

(c) Discuss with management and the independent auditor management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act.

(d) Periodically review with management and the independent auditor any significant deficiencies or material weaknesses in the design or operation of internal controls, any fraud that involves management or other employees who play a significant role in the Company's internal controls, disagreements with management or scope restrictions encountered in the course of the independent auditor's work, if any.

69. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false or misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the

Verified Shareholder Derivative Complaint

Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     Ultragenyx is a biopharmaceutical company incorporated in Delaware and headquartered in Novato, California. The Company focuses on developing therapies and products for the treatment of serious rare and ultrarare genetic diseases.

71.     One such rare genetic disease is OI— also known as brittle bone disease. Leading up to and during the Relevant Period, the Company continued to develop and research its clinical product candidate, setrusumab, as a potential treatment for OI— throughout which the Individual Defendants overstated setrusumab's efficacy.

72.     In June 2023, the Company announced positive data from its Phase II portion of the Phase II/III Orbit study. Throughout the Relevant Period, the Individual Defendants relied on the positive results of the Phase II portion of the Orbit study to assure investors that the Phase III OI Studies would also achieve successful results.

73.      Moreover, by October 2023, the Company announced and began planning the Phase III portion of its Orbit and Cosmic studies. In April 2024, the Company completed enrolling patients for its Phase III Orbit and Cosmic studies. Phase III of the Orbit study enrolled 159 patients, ages 5 to 24 years old. The Orbit study is randomized and placebo controlled and is focused on evaluating the effect that setrusumab has on the annualized fracture rate compared to the placebo. Phase III of the Cosmic study enrolled 69 patients aged 2 to 6 years of age. The Cosmic study is an active controlled study, focused on evaluating the effect of setrusumab on the annualized total fracture rate of patients compared to intravenous bisphosphonate (IV-BP) therapy.

74.     As the Phase III OI Studies continued and throughout the Relevant Period, the Individual Defendants created a false impression surrounding setrusumab's efficacy,

26

Verified Shareholder Derivative Complaint

competitiveness as a treatment compared to other existing and developing OI treatments, and the success of the Phase III OI studies.

## FALSE AND MISLEADING STATEMENTS

*November 7, 2024, Earnings Call*

75. On August 3, 2023, the Company held an earnings call to discuss its financial results for the period ended on June 30, 2023 ("Q2 2023 Earnings Call").

76. During the Q2 2023 Earnings Call, Defendant Kakkis touted his confidence in achieving successful results in the Phase III OI Studies and further touted setrusumab's potential to decrease the annual fracture rate in OI patients. In particular, Defendant Kakkis stated:

> I'll spend a few minutes discussing the osteogenesis imperfecta . . . program . . . In June, we reported exciting data from the Phase II dose-finding portion of the pivotal Orbit study, showing statistically significant increase in levels of serum P1NP, a sensitive marker bone formation.
>
> The bone production response to these patients was extraordinary. This led to a rapid bone-building effect following just 3 months of treatment with setrusumab, resulting in nearly 10% in lumbar bone mineral density. At baseline, these patients had very limited bone mineral density, with an average Z-score in the 20 mg cohort of minus 2.12, which means the bone mineral density were 2 standard deviations below the mean of normal patients for their age.
>
> After 3 months on therapy, the mean Z-score increased by plus 0.65 points, resolving nearly 1/3 of the deficit from normal in a relatively short period of time. *As we've said before, patients are showing meaningful improvements in bone health, and we are highly encouraged with how they're doing. Improved bone health refers to the instance of fractures, bone pain and relative global health and activity of the patients*.[1]

77. Defendant Kakkis continued by adding:

---

[1] Unless stated otherwise, all emphasis herein is added.

In July, we announced that we initiated dosing patients in 2 Phase III studies evaluating setrusumab in 2 different age groups. ***The Phase III portion of the pivotal Orbit study is evaluating the effect of setrusumab compared to placebo on annualized clinical fracture rate in patients 5 to 25 years old.***

***The newly initiated Phase III Cosmic study is an active controlled study evaluating setrusumab compared to IV bisphosphonate therapy on annualized total fracturated patients aged 2 to 5 years old***. Enrollment in both of these studies is going well so far in part because the Phase II data has generated a lot of excitement for the potential setrusumab for both the clinical sites and from the patient community.

78.     During the Q2 2023 Earnings Call, research analyst from Evercore ISI Institutional Equities, Liisa Ann Bayko ("Bayko") asked Defendant Kakkis to comment on his confidence level regarding the Phase III OI studies and in particular. In response, Defendant Kakkis emphasized his high level of confidence, stating:

*Bayko* - Can you just give us a sense of kind of your level of confidence about what you're seeing in the OI program and how the changes in bone mineral density relate to potential changes you might see in fracture?

*Defendant Kakkis* - ***We have a high level of confidence that the magnitude of bone mineral density we saw at 3 months was already sufficient enough to improve the strength of bones and probably reduce fractures at that level we saw at 3 months in.*** So we have high confidence in the fact that bone mineral density will be improved by this mechanism, anti-sclerostin mechanism, where you're getting anabolism or production of new bone will translate into fracture improvements.

And we've talked about the nonclinical data in the past, but we'll be able to talk more about this at the October Analyst Day to provide that support, ***but we have a high level of confidence that the BMD produced by an anti-sclerostin like setrusumab will translate into fracture reduction.***

*Bayko* - Just as a follow-up on that. Can you explain to me the amount of sort of the bone mineral density levels of OI patients? How do they relate to those of osteoporosis patients? Because I'm just trying to kind of relate the 2 changes, and the amount of changes you're seeing to what we -- outcomes we've seen in osteoporosis. It seems to me maybe that bone mineral density levels are slightly different. Can you expand on that at all?

Verified Shareholder Derivative Complaint

*Defendant Kakkis* - Well, sure, Liisa. What we said for this population, this study, is that the mean bone mineral density was minus 2.12, which means 2 standard relatable mean of normal people. Now osteoporosis patients have reduced bone mineral density. I don't have for you exact comparisons to put forth.

But I would say the mean of minus 2 standard deviations is pretty low on the bone scale. And if you look at the range, we had patients as low as minus 4 standard deviation. So these patients have, I think, a more severe on average bone mineral density problem than an average osteoporosis patient would, and therefore, have more need of bone production.

***What has been the misunderstanding is everyone thought that the defect in the collagen was why the bones are fracturing. What we're kind of trying to say is actually, while that may be a factor, it's in fact the effect of that mutation on bone production appears to be a bigger factor. And that's something we can change with setrusumab, and that's why we think we're going to have an important effect on OI.***

***November 2, 2023, Earnings Call***

79.     On November 2, 2023, the Company held an earnings call to discuss its financial results for the period ended on September 30, 2023 ("Q3 2023 Earnings Call").

80.     During the Q3 2023 Earnings Call, Defendant Crombez discussed the results of the Phase II Orbit study and how it relates to the Phase III study. Specifically, Defendant Crombez stated the following:

Importantly, a subset of 5- to 12-year olds saw nearly a 20% increase in bone mineral density with a Z-score change of 1.19***. These improvements in bone mineral density across the 24 patients treated in the ORBIT Phase II translated to a 67% reduction in the annualized fracture rate following treatment with setrusumab for at least 6 months.*** 20 of the 24 patients did not experience any new fractures in the 6 months following treatment with setrusumab.

For the 4 who did have a radiographically confirmed fracture, many of them occurred early on in treatment or had a traumatic precipitating event. The data is all the more compelling because many of the patients in this study were previously treated with phosphonates over the 2 years prior to dosing with setrusumab. During this time, these patients continued to see a high annualized fracture rate with many fractures occurring with very minimal

29

Verified Shareholder Derivative Complaint

activity. These types of fractures are referred to as fragility fractures and examples include fractures occurring during sleep or when transferring out of a chair.

What we heard from 2 principal investigators who joined us at Analyst Day *is that they are not seeing fragility fractures in these studies, patients treated with setrusumab and that many of these kids are now feeling strong enough to engage in more physical activities with friends and family.*

81.     During the question-and-answer portion of the Q3 2023 Earnings Call, a research analyst, Dae Gon Ha ("Ha"), asked about whether increased strenuous activity during and after treatment in patients would be a confounding variable. Defendant Kakkis responded by assuring investors and minimizing any potential risks, stating:

*Ha* - Two, maybe on GTX-102 and the setrusumab. Just wanted to clarify on setrusumab, Emil, did you say enrollment completion in 1Q '24? Is that for both ORBIT as well as COSMIC? And are you placing any protocol restrictions on strenuous activity? I mean it's encouraging their being more active and fearless but in terms of endpoints, I wonder if that could kind of create a confounder . . .

*Defendant Kakkis* - So for setrusumab, we're talking about both ORBIT and COSMIC in terms of finishing enrollment. I think we're likely. But the main one we're talking about is ORBIT, which is the main driver. And I believe both of them should get done in that time frame. And in terms of this control of excise [sic] or the hazard risk, if someone is feeling better and exercising, well, that's already what's happening in Phase II. *People were a lot more active and what was, actually, on the plus side is that they were active and a lot of them where they were falling and had fractures unnecessarily. So while there is some risk that they might be doing more, there was one person who played volleyball, that they hadn't been playing.*

*We're actually -- overall feeling is that the pattern of having falls and fractures seems to be better. And so our net effect overall, as we think even with increased activity, there will be a reduction in fractures*, which is really the best thing possible, that is, a kid is going to be active and to have a reduction of fractures while being active. *So we're not so worried about the, let's say, the noise of having more fracture risk at this point. It looks like you still see the effect well, even if there is some risk there.*

Verified Shareholder Derivative Complaint

***April 26, 2024, Proxy Statement***

82. On April 26, 2024, the Company filed a Schedule 14A with the SEC ("2024 Proxy Statement"). Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

83. The 2024 Proxy Statement called for the Company's shareholders to vote, *inter alia*: (1) re-elect Defendants Dunsire, Narachi, and Sanders; (2) approve an amendment the Company's Amended and Restated 2023 Plan (the "2024 Amendment to the 2023 Plan"); (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ended on December 31, 2024; and (4) approve, on an advisory basis, the compensation of the Company's executive officers.

84. The 2024 Proxy Statement noted if approved, the 2024 Amendment to the 2023 Plan will cause 4,000,000 shares to be made available under the plan. Per the 2024 Proxy Statement, as of March 28, 2024, there were 952,800 shares still available for grant under the prior Plan meaning that if the 2024 Amendment to the 2023 Plan is approved, there would be a total of 4,952,800 shares available for grant. The 2024 Proxy states that employees, executives, and directors are eligible to participate in the 2024 Amendment to the 2023 Plan. It further notes that if the 2024 Amendment to the 2023 Plan was not approved, the Company "will not have adequate shares to continue to grant equity awards to all our employees and directors in 2025."

85. Regarding the "Board Leadership Structure," the 2024 Proxy stated:

We currently separate the positions of Chairman of the Board and Chief Executive Officer, which allows our Chief Executive Officer, Dr. Kakkis, to focus on our day-to-day business, while allowing the Chairman of the Board, Mr. Welch, to lead the Board in its fundamental role of providing advice to and independent oversight of management. Independent oversight of management is an important goal of the Board, which is why our Corporate Governance Guidelines provide that a lead independent director will be

31

Verified Shareholder Derivative Complaint

appointed by the Board if the Chairman is not independent. Additionally, our Board recognizes the time, effort, and energy that the Chief Executive Officer is required to devote to his position in the current business environment, as well as the commitment required to serve as our Chairman. Our Board also believes that the separation of the Chairman and Chief Executive Officer positions fosters a greater role for the independent directors in the oversight of our Company and active participation of the independent directors in setting agendas and establishing priorities and procedures for the work of our Board. The benefits of the separated Chairman and Chief Executive Officer positions are augmented by the independence of eight of our nine current directors, including our Chairman, and our independent Board committees that provide appropriate oversight in the areas described below. At executive sessions of independent directors, these directors can speak candidly on any matter of interest. The independent directors of the Board regularly meet in executive sessions, and met four times in 2023, and the Chairman presides at these sessions. We believe this structure provides effective oversight of our management and the Company.

The Board believes that its programs for risk oversight, as described under "Role of the Board in Risk Oversight" below, would be effective under a variety of leadership frameworks. Accordingly, the Board's risk oversight function did not significantly impact its selection of the current leadership structure.

86. Regarding the "Role of the Board in Risk Oversight," the 2024 Proxy stated the following:

The Board has overall responsibility for the oversight of our risk management process, which is designed to support the achievement of organizational objectives, including strategic objectives, to improve long-term organizational performance, and enhance stockholder value. Risk management includes not only understanding company-specific risks and the steps management implements to manage those risks, but also assessing what level of risk is acceptable and appropriate for us, taking into account the immediacy of any such risks, and evaluating risks and circumstances across various timeframes, including the short, medium and long term. Management is responsible for establishing our business strategy, identifying and assessing the related risks, and implementing appropriate risk management practices. The Board periodically reviews our business strategy and management's assessment of the related risk and discusses with management the appropriate level of risk for us. The Board also periodically evaluates and discusses

32

Verified Shareholder Derivative Complaint

potential emerging risks with members of senior management as well as third-party advisors and experts. In 2023, the Board and the committees, as appropriate, reviewed with management the various risks and mitigation strategies related to the macroeconomic environment, cost containment strategies, prioritization of the Company's pipeline programs, cybersecurity risks and the Company's initiatives related to Corporate Responsibility and sustainability matters. The Board also delegates to Board committees oversight of selected elements of risk as set forth below.

87. Regarding "Global Code of Conduct," the 2024 Proxy Statement provided:

We have adopted a Global Code of Conduct that applies to all of our employees, officers, and directors, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. Our Global Code of Conduct is available on our website, *www.ultragenyx.com,* under the "Corporate Governance" subsection of the "Investors" tab. We intend to promptly disclose on our website any future changes or amendments to, or waivers of, to the Global Code of Conduct that we are required to disclose under applicable rules. Our Board is responsible for applying and interpreting the Global Code of Conduct in situations where questions are presented to it.

88. Regarding the Company's Audit Committee, the 2024 Proxy Statement stated the Audit Committee is responsible for the following:

• Appoints, approves the compensation of, reviews the performance of, and assesses the independence of our independent registered public accounting firm

• Approves audit and permissible non-audit services, and the terms of such services, to be provided by our independent registered public accounting firm

• Reviews the audit plan with the independent registered public accounting firm and members of management responsible for preparing our financial statements

• Reviews and discusses with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures and critical accounting policies

• Reviews the adequacy of our internal control over financial reporting; establishes policies and procedures for the receipt and retention of accounting-related complaints and concerns

33

Verified Shareholder Derivative Complaint

• Recommends whether our audited financial statements shall be included in our annual reports on Form 10-K

• Prepares the audit committee report to be included in our annual proxy statements

• Reviews all related-person transactions

• Reviews policies related to financial risk assessment and management

• Establishes, maintains, and oversees our Global Code of Conduct

• Assists the Nominating and Corporate Governance Committee by overseeing our compliance program with respect to legal and regulatory requirements impacting areas of financial risk

• Annually reviews and reassesses the adequacy of the Audit Committee charter and performs other duties, as specified in the charter

89. Regarding the Company's Research and Development Committee, the 2024 Proxy Statement stated the responsibilities of the Research and Development Committee as:

• Evaluates and advises on our key R&D activities and early pipeline development goals and strategy

• Assesses the resources and budget allocated to R&D spend and provides guidance regarding the investment of resources in pipeline growth

• Evaluates and provides input with respect to the quality of the science being conducted and overall program execution

• Assesses the overall quality of the R&D programs and prospects for progression to monitor our pipeline to maintain product flow

• Evaluates our clinical-stage pipeline and its progress, as well as those operational execution initiatives that are important for filing and approval of products in our pipeline

• Performs other duties as specified in the Research and Development Committee Charter

34

Verified Shareholder Derivative Complaint

90.    Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch cause the 2024 Proxy statement to be false and misleading by failing to disclose, *inter alia*: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

91.    The 2024 Proxy statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directs adhered to its Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

92.    As a result of Defendant Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch causing the 2024 Proxy statement to be false and misleading, the Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve the Company's 2024 Amendment to the 2023 Plan,; (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ended on December 31, 2024; and (4) and approve, on and advisory basis, the compensation of the Company's named executive officers.

93.    As a result of shareholders approving the 2024 Amendment to the 2023 Plan, the plan took effect immediately upon reaching shareholder approval on June 18, 2024. An additional 4,000,000 shares were made available for grant, meaning there were 4,952,800 shares available for issuance under the 2024 Amendment to the 2023 Plan. The

Individual Defendants, many of whom are directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2023 Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock wards and will continue to receive material personal benefits in the form of stock awards to the 2024 Amendment to the 2023 Plan in the future.

### *May 2, 2024, Earnings Call*

94. On May 2, 2024, the Company held an earnings call to discuss its financial results for the period ended on March 31, 2024 ("Q1 2024 Earnings Call").

95. During the Q1 2024 Earnings Call, Defendant Kakkis discussed the two interim analyses planned for Phase III OI Studies, stating the following, in relevant part:

> For the UX143 Phase 3 portion of the Orbit study, there are 2 interim analyses planned with the first anticipated by the year-end or early 2025. The first analysis will have a stringent threshold of p less than or equal to 001. If the threshold is not met, a second interim analyses will occur a few months later, followed by a final analysis at 18 months.

> Interim analyses will not report to the company by the Data Monitoring Committee unless they are positive. In the event of a positive interim analyses, we would share that outcome, but top line results will not be announced immediately as the study would require patients to complete a final visit and time to collect and prepare the data for a formal analysis.

96. Moreover, during the Q1 2024 Earnings Call, Defendants Kakkis and Crombez discussed protocol planned to control fracture rates to optimize the Clinical Studies' chance of meeting its primary endpoints. Specifically, a research analyst from Cantor Fitzgerald & Co., Kristen Brianne Klusta ("Klusta"), asked, "Could you please help us frame what are some of the factors that are controllable that we can kind of predict in advance? And then some of the items where we're less sure about." Defendant Kakkis

Verified Shareholder Derivative Complaint

responded by assuaging investor concerns by emphasizing his confidence in the methodology and enrollment processes of the Phase III OI Studies, stating:

*Klusta* - We often get asked about setting expectations for the first interim readouts for setrusumab. Could you please help us frame what are some of the factors that are controllable that we can kind of help to predict in advance? And then some of the items where we're less sure about. And again, how to help frame these 2 expectations?

*Kakkis* - Well, I think our Phase 2 data kind of lay down what I think we're going to expect. I would expect it to be -- *that a reduction would be very similar to what we've seen, if not better*. So we found there with only a minimum of 6 months, an average of 9 months exposure, 67% reduction. The patients we're enrolling are very comfortable with that. *If anything, enrolled patients might have a higher fracture rate, I think. And so we would expect that reduction to be something that you'd expect to see.* Those are -- I don't know if you consider -- when you enroll patients with fractures, it's not exactly controllable. They are who they are. *But because we have a threshold requirement to get in the trial, we're essentially eliminating patients who would have very low fracture rates and wouldn't necessarily be able to demonstrate benefit in that period of time.*

I think with the type of patients enrolled, the number of which type*, I think we've set ourselves up to replicate what we saw before. And I really don't see any uncontrolled factors*. I don't know, Eric, if you have anything.

97.   Defendant Crombez further disseminated this outlook by adding that:

Yes, definitely. I mean, *I think the biggest controllable factor was really enrollment rate and the studies are fully enrolled*. Yes, we know the types of patients, and it was good to get a good mix of 1, 3 and 4 in there. I would say, yes, *I would agree, the uncontrollable factor may be, especially when you're first initiating treatment in the first couple of months, you may have some patients arriving with fractures before, setrusumab really takes effect there.* But there is a degree of unpredictability with fractures.

98.   Defendant Kakkis ultimately concluded by minimizing the potential control risks and instead reframing said risks as support for UX143's efficacy, stating:

37

Verified Shareholder Derivative Complaint

It's probably also the fact that some people -- *some of the kids like feel really good and are getting more active. People are worried maybe that caused more fractures, but it didn't look like that was true or that they felt they didn't fracture. So we actually are not concerned about the fact that his [sic] might feel good and start being more active. It doesn't look like it's going to cause a problem that looks like their bones are stronger and they're doing great.*

So the *truth is that more activity probably strengthens the bone faster because the action actually puts strain in the bone, the bone actually are strengthened by that actual action.* So thank you for the question.

***August 1, 2024, Earnings Call***

99. On August 1, 2024, the Company held an earnings call to discuss its financial results for the period ended on June 30, 2024 ("Q2 2024 Earnings Call").

100. During the question-and-answer portion of the Q2 2024 Earnings Call, the Individual Defendants were asked about how Phase II data translates to the current Phase III studies, the effects of patient improvements on fracture rates, and the Individual Defendants' assumptions on Phase III study. Defendant Kakkis confidently responded to this by stating:

*Salveen Jaswal Richter ("Richter")* - Could you help us understand how you look on OI with regard -- how you look at OI with regard to the Phase II data translating to Phase III here? And particularly, as the patients see improvements, how that kind of impacts the rate of fractures here for the population, and your assumptions around that in the Phase III trial?

*Defendant Kakkis* - Well, I think what we've shown at the 14-month data was, in fact, that the bone marrow density continues to increase dramatically. And the p-value got much smaller. So remember, that's looking at all the patients, not just the median, but it tells you -- *the p-value declining substantially tells you that all the patients are moving toward a reduction in fractures. So we feel that the effect is very large.*

In terms of translating to Phase III, we know from the data we had in a few placebos that they do not see bone marrow density improvement during this period of time. So there will be no placebo effect from that.

Verified Shareholder Derivative Complaint

With regard to fractures, *fractures are dependent on both disease severity and also environmental factors like what the patient is doing. Our expectation is that patients, when they feel better, could start doing more work, but what we have seen is patients that have gotten stronger and have been on treatment for a longer period of time will have falls and not have fractures. So we feel pretty confident that the strength of bones as such to even compensate for any change might occur because patients are more active.* But we do think that the way patients feel their activity will bode well for supportive clinical data and how the patients are doing, which I think will support the value of the product and its clinical meaning for this.

101. The Individual Defendants were further asked to touch on the potential effects that setrusumab has the pain patients experience and whether the reduced fracture rates and increased bone density plays a part in this. In response, Defendant Kakkis overstated potential success of the Phase III OI Studies and the ability to reach its endpoints. Specifically, Defendant Kakkis stated the following:

*Klusta* - Congrats on a great quarter. On setrusumab, I wanted to ask if you think that there are any benefits this drug could potentially show as it relates to the pain these patients experience. Is there a reason to think that both reducing those fractures and putting down better bone has the potential to have an impact on pain?

*Defendant Kakkis* - Yes. Our impression from the Phase II patients, particularly with their increased activity, they're feeling better. They're having less pain. And while we look -- talk about fractures all the time, OI patients have weak bones. And what that means is lots of microfractures. So if they do some heavily strong activity, they'll feel terrible the next day because they probably have induced a bunch of microfractures. So it's not a single point fracture.

*What we can see from the patients treated at the 1-year point or beyond? Patients are having much more activity, not needing wheelchairs, not being as afraid of physical activity. So we have confidence that stronger bones will reduce microfractures and will improve pain.* And so we are evaluating both pain, quality of life and other measures in the study. *And it's a large enough study that it should help us power those endpoints.* So we think it's one of the ways that will make, I think, setrusumab a really important therapy for OI.

39

Verified Shareholder Derivative Complaint

102. Moreover, during the Q2 2024 Earnings Call, the Individual Defendants were again asked about the control factors of the Phase III Studies, particularly the effect of increased physical activity on fracture rates and bone density. Instead of directly answering how this factor would effect the controls in place and the structure of the Phase III OI Studies, Defendant Kakkis minimized the potential risks and provided the following anecdotal and general claims:

*Klusta* - And then just on that point, I know people sometimes ask, if you're feeling better and you're doing more activities, does that open the door for any potential fractures? But maybe on the other end of that spectrum, if people are exercising and doing more activity, could that help even further slowdown any type of bone loss or density loss?

*Defendant Kakkis* - Yes, it's a very good point. I think it certainly could increase fracture risk. We did have a patient who started doing sports again and did have a fracture, but I'm not the one to tell a patient, you feel great now, now don't do anything with that, right? It's just not rational to think that. ***What I will say is these patients, if you're sedentary, you or I sit in our bed and we don't do enough, our bones get weaker. So the exercise they do will actually stimulate their bones to lay down the bone where their bone is weakest. It will actually enhance their bone strength further.*** So I think it'll have a beneficial effect for them to be more active and -- with sports or anything else. ***So we're not worried about the moral risk of getting more fractures. We think it's part of a healthy pattern towards more activity, stronger bone and better lives for these OI patients.***

103. As the Q2 2024 Earnings Call continued, a research associate from Morgan Stanley, Michael H. Riad ("Riad"), asked "thinking about that cycle of fractures leading to bone deformation and then loss of activity. What factors do you think play a role -- bigger role in the treatment course?" and "do you view it as like a broadly better option for most pediatric patients regardless of type, whereas for adults you'd expect more OI-type-dependent penetration?" Defendant Kakkis responded with the following:

*Riad* - This is Michael Riad on for Jeff Hung. Going back to setrusumab and thinking about that cycle of fractures leading to bone deformation and then loss of activity. What factors do you think play a role -- bigger role in the treatment course? Is it age or OI type? I mean, if you think about like the

Verified Shareholder Derivative Complaint

profile of setrusumab, do you view it as like a broadly better option for most pediatric patients regardless of type, whereas for adults you'd expect more OI-type-dependent penetration?

*Defendant Kakkis* - Well, I think each patient is going to have a reason to be treated. It may be different. If you're a Type 3 patient or Type 4 with a really severe bone disease, and you're treated when you're 1 or 2 years old, our hope, and we will see what the Phase III data show, is that we could be transformed in terms of stopping fracture, stopping vertebral compression and not basically destroying your skeleton before you're 3 or 4 years of age and ending up in a wheelchair. So that would be what you could do when you're treating kids that are young.

However, when they're old, like even if you're in a wheelchair because you have deformed bones, you're still fracturing, you're still in pain all the time. **Being able to stop being in pain by stopping fracturing,** even if you can't change deformation, it's still highly valuable in an adult with Type 3 or 4.

**For Type 1, probably the superior half of that population will have enough fractures where at any age, young or old, it's going to be beneficial.** They don't have as much deformation, but being able to be comfortable, participating in sports or activities you might not have been doing before, I think will get Type 1s treated.

There may be some Type 1s who are milder, don't have as many fractures, and there might not be as an addressable -- as much addressable need in those patients. So we wouldn't expect all the Type 1s. **What I can say from the data we've shown you though, the Type 1s do really well on the treatment as do the Type 3s and 4s. So we expect that we'd have a good penetration of all 3 types as well as in all ages because we think there's a reason to treat at any point in life in almost any of these diseases.**

104. The discussion of the Q2 2024 Earnings Call then turned to a discussion of the potential competition in the OI treatment market. A research analyst from Evercore Institutional Equities, Jingming Chen ("Chen"), asked about "what implications do you think it would have for setrusumab if Amgen decides to pursue approval in OI?" Defendant Kakkis responded by minimizing viability of any potential competition and emphasizing setrusumab's efficacy. Defendant Kakkis stated:

*Chen* - This is Jingming on for Liisa. So we noticed that Amgen is running an open-label Phase III study for romosozumab in OI, and they have indicated that if the Phase III study is positive, they may have an opportunity to pursue

Verified Shareholder Derivative Complaint

approval and launch in OI. So I'm just wondering what implications do you think it would have for setrusumab if Amgen decides to pursue approval in OI?

*Defendant Kakkis* - Well, that's news to us. They've already given us the intellectual property access. So I don't think they've had that much interest in it. They -- it's a biologic for them. Osteoporosis is a huge indication. It's growing. There's a big shift toward anabolic agents in osteoporosis. I really think that's their focus.

With regard to OI, we've seen their Phase II data. We understand their dosing from the published comments in the clinicaltrials.gov, or the European version of it. Right now, they're getting substantially less bone mineral density at the dose levels they're using. ***So we're a superior treatment in terms of our bone mineral density improvement, and we will then be superior in fracture reduction.***

So I think you should look at this as an unclear story. What they've done in their Phase III is not optimize the drug nor the presentation for OI. And so I really don't have concerns right now because we know our data. It's far superior for them to get to our data. They would have to change their dosing dramatically from Phase III, which is not likely to happen at this point. ***So at this point, I think they will be inferior to us, and I think that will be a factor.***

***November 5, 2024, Earnings Call***

105. On November 5, 2024, the Company held an earnings call to discuss its financial results for the period ended on September 30, 2024 ("Q3 2024 Earnings Call").

106. During the Q3 2024 Earnings Call, a senior research analyst from Piper Sandler & Co, Christopher Josephe Raymond ("Raymond"), asked the Individual Defendants to expand upon the methodology of the Phase III OI Studies, specifically asking for "more color on this negative binomial regression model that you're using just to explain a little bit about what that means, what you're doing there?" In response, Defendant Kakkis highlighted the rigor of protocols and methodology used, and stated the following:

*Raymond* - . . . And then maybe also a follow-up on setrusumab. Can you give a little bit more color on this negative binomial regression model that you're using just to explain a little bit about what that means, what you're doing there?

Verified Shareholder Derivative Complaint

*Defendant Kakkis* - With regard to setrusumab, P. K. Tandon, our Head of Biometrics, a highly experienced biometric statistician who was at Genzyme for 20 years and has done probably more rare disease programs than anyone, believes ***a negative binomial model is the best way to do an event-driven analysis, and it's a basic model that the FDA has agreed to.*** We are -- for me to go through the math would be probably pretty difficult, but we probably can provide some explanation for investors on that model. ***But it's the best way to look at events and looking at event rates and being able to control in the model for things like baseline fracture rate or age or other factors that will be different between different patients. So while I can't explain it, what I can say is the study is very well powered to succeed in the setrusumab Orbit study.***

107. As the Q3 2024 Earnings Call continued, a senior research analyst from Leerick Partners LLC, Joseph Patrick Schwartz ("Schwartz"), first asked the Individual Defendants to elaborate on "how you're calculating the effect size in Orbit, how that compares to how you did in Phase II and then the range of effect size separation that might be needed in order to hit stat sig at different interim analyses . . ." Responding to this initial question, Defendant Kakkis stated that:

*Schwartz* - Great. I also have a couple of questions on setrusumab. I was wondering, first, on Orbit, if you could talk a little bit more about how you're calculating the effect size in Orbit, how that compares to how you did in Phase II and then the range of effect size separations that might be needed in order to hit stat sig at different interim analyses would be very helpful. And then I have a followup on Cosmic.

*Defendant Kakkis* - Well, we assumed a 50% reduction in fracture rate and a fracture rate of 0.7 for the powering estimate. However, for the interims and the choice of doing interims, that was based on the concept there could be more fractures events happening, not a higher fracture rate reduction. ***And so if there are more fractures, it improves the power to detect that result earlier, right, just because more events defined.***

So the effect size of 50% and the fracture rate, 0.7, was what was used in both the power and design. Given that the fracture rate reduction was closer to 67%, which could be similar or higher with the binomial***, I think we feel pretty comfortable that we're in good position in how we've designed the study.*** So that's sort of what happened there with regard to the effect size.

43

Verified Shareholder Derivative Complaint

108.    Schwartz then followed up with another question about the Cosmic study. Particularly, asking "what kind of a treatment effect do you assume in your powering relative to bisphosphonates? What do you hope to see for the setrusumab arm? Are there any nuances in terms of how the end points in Cosmic are calculated versus Orbit?" Defendant Kakkis responded to this question with the following:

*Scwhartz* - Okay. So in terms of Cosmic, what kind of a treatment effect do you assume in your powering relative to bisphosphonates? What do you hope to see for the setrusumab arm? Are there any nuances in terms of how the end points in Cosmic are calculated versus Orbit?

*Defendant Kakkis* - Well, keep in mind something about Orbit and the Phase II part Orbit is those patients were -- the vast majority of those patients had been on bisphosphonates. The bisphosphonates are in their bones. ***So when we're looking at the 67% reduction,*** that's really like setrusumab on top of bisphosphonates, just to be clear, right? That's not -- ***so we'd expect that a similar differential occur even head to head with bisphosphonates, right? It is really like an add-on, if you will, in Orbit because they already have them in their bones.***

There might be some tailing off of the bisphosphonate effect in Orbit. But in Cosmic, everyone had to be on bisphosphonates upfront, so our expectation is actually similar in terms of we went with the 50% reduction in fracture rate.

***Now the fracture rate in little kids can be much higher. It could be several fold higher, which is partly why the study is in the 60- to 70-patient range rather than 150. But that's our assumptions right now.***

109.    On the same call, the Individual Defendants were also asked about the timelines of the first and second interim analyses and factors that have influenced the Individual Defendants' confidence on the matter. Defendant Kakkis responded with the following, in relevant part:

*Huidong Wang* - I have one question regarding setrusumab Phase III study. I mean you did actually provide a little bit more clarity regarding the time line. I remember last time was more likely beginning of 2025. Now is at year-end '24, beginning of 2025. And second interim, very definitive, is 1Q '25. Is that because the event's already picking up and you have more clarity regarding when this will happen?

Verified Shareholder Derivative Complaint

And then also, will you share the baseline characteristics of Phase III trial at some point? If not, could you comment on patient baseline attack rate range and also the breakdown of the patients, specifically between age 5 to 12, 12 to 18 and 18 to 25?

*Defendant Kakkis* - With regard to the first interim timing, the clarity on the timing is not based on data we're collecting, so it's not based on fractures. We said from the beginning that would be end of the year, early 2025. And then a few months later, we're being a little more specific saying middle for 2025, but it was always a few months. ***So we weren't intending to change anything. It was just where the time line is.*** But we did change -- a long time ago, we talked about having fracture number as being the trigger, but because it was so operationally challenged*, we just estimated when we hit a certain number of fractures. But none of the change in timings were related to the fractures.*

We haven't put out baseline characteristics yet, but we will at the appropriate time. Usually when we bring out the Phase III data, we'll bring in the characteristics, but we would not expect to put out that data until we're releasing our Phase III data. ***What we have said to date is that the population has more type III and type IV patients, closer to half or more as opposed to what was in Phase II where there was about 1/3, and so that's 1 difference. We'd expect those patients to have more fractures. We expect then the Phase III trend -- study to have a higher fracture rate than what we saw before.***

But right now, ***we haven't put in the breakout for age groups that are enrolled in the study either. It is spread across the age groups. It is primarily ped study with the majority of the patients in the peds age range.*** We are stratifying in the randomization to make sure that we're -- we have similar populations in both groups. That's where we stand. Thanks for the good questions.

110. Moreover, during the Q3 2024 Earnings Call an analyst from Jefferies LLC, Maurice Thomas Raycroft ("Raycroft"), asked "what are key learnings from the Phase II 14-month data update at ASBMR that help you triangulate around fracture rates and chances of success for the first interim or second interim updates[,]" and "if you can clarify if you'll have new patients with less follow-up in the Angelman data updates that you have." In response, Defendant Kakkis overstated the applicability of the Phase II findings to the current study, specifically stating:

45

Verified Shareholder Derivative Complaint

*Raycroft* - Congrats on the progress. For setrusumab, just wondering what are key learnings from the Phase II 14-month data update at ASBMR that help you triangulate around fracture rates and chances of success for the first interim or second interim updates. And maybe just a quick follow-up, if you can clarify if you'll have new patients with less followup in the Angelman data updates that you have.

*Defendant Kakkis* - Okay. So I think what we learned from the 14-month update on setrusumab was, in fact, that ***these patients can have a very profound degree of separation, and that separation can lead to the majority of patients having no fractures over a significant period of time.***

The other thing we learned is that particularly ***the younger patients have a dramatic improvement in bone mineral density. So I think what we learned is that how strong the effect could be, and that gave us more confidence in putting in the interim in the first place*** because if they are separating very quickly within 2 or 3 months and if that effect size is large, then we would expect the groups could separate early. We just don't know for sure. We set a stringent threshold for the first one.

The second one, less so. But that data gave us confidence that we can do that. ***It also gave us confidence we can lower the number of patients modestly and shorten the time line then to finish enrollment.*** So those are the things we learned and what we expect to know. And everything that we've seen so far tells us that we have a strong effect going on, and we want to reach that as promptly as we can.

111.   Furthermore, during the Q3 2024 Earnings Call questions were asked about the placebo arm of the Phase III OI studies. In particular, Klusta asked "[w]e know that the 5 bisphosphonate studies had diverse readouts. So can you give us some context about how you developed that 20% figure?" In his response, Defendant Kakkis again overstated the potential efficacy of setrusumab in comparison to other treatment forms and stated that:

*Klusta* - On setrusumab, I was hoping to get a little bit more color around thoughts about the placebo arm. We know that the 5 bisphosphonate studies had diverse readouts. So can you give us some context about how you developed that 20% figure? And then is there any possibility in this trial that because patients are used to being quite inactive that we could see more fractures on placebo if the protocol requires them to go to the clinic?

*Defendant Kakkis* - Yes. So there were -- we're aware of 5 randomized studies to look at bisphosphonates. Three of them failed and 2 of them were

Verified Shareholder Derivative Complaint

successful. And the 2 that were successful, there was an estimate that they had a reduction of 20% in fracture reduction. And they did make patients feel better, too, which is one of the reasons why people are using it, less about fracture reduction than feeling better, which is probably dealing with like micro fractures and something of that kind. So the data are not really that compelling, *but if you look at our own Phase II data, the 67% reduction was on top of bisphosphonates, which were on the majority of those patients. So it's pretty clear what -- we should be able to see a substantial difference between the 2.*

Now if you talk about the placebo arm in the study, *they're not getting the bisphosphonates anymore during the study, so they will be weaning*, which might have some impact on their bones over the period of the year. *But in addition, most of them would be normally staying at home. And we know that by coming in the clinic alone, the incident of accidents and fractures goes up. It's one of the reasons patients are elected to come in a placebo-controlled study.*

*They know going back and forth the clinic every month opens them up to having fractures. So we'd expect actually the clinical activity to actually increase their fractures, which would give us more opportunity to detect the difference between them.* So -- but because the data in the Phase II were so strong, the doctors, the patient decided they want to get in even if they got placebo because they realized they would cross over on the drug before anyone else, and they want that opportunity. *So that's why we suddenly were able to get enrollment to crank up and go real well as people felt like this is going to be too big a difference to not want to be part of it.*

### January 12, 2025 Press Release

112.    On January 12, 2025, the Company published a press release announcing its preliminary financial results for the fiscal year ended on December 31, 2024, and its guidance for the following year. In this press release, the company also announced the "UX143 (setrusumab) Phase 3 *Orbit* study is progressing with the second interim analysis in mid-2025."

### January 13, 2025 J.P. Morgan Conference

Verified Shareholder Derivative Complaint

113. The next day, January 13, 2025, the Company presented at the 43rd Annual J.P. Morgan Healthcare Conference 2025 ("2025 J.P. Morgan Conference") where it discussed the Phase III Orbit study interim results.

114. During the 2025 J.P. Morgan Conference, Defendant Kakkis was asked whether he agreed or disagreed with the notion that after the first and second interim analyses, "the probability of technical success is now different for the Orbit study." Defendant Kakkis in his response, overstated the potential for the Orbit study's success and mislead the investing public that he was in possession of reliable information that supported this position. Specifically, Defendant Kakkis stated:

> *Anupam Rama* - . . . There's this thesis out there now that you've gone past the first interim to the second interim that somehow the probability of technical success is now different for the Orbit study. Do you agree with this? Where would you push back on that?
>
> *Defendant Kakkis* - No, no, I completely disagree. The idea of the first interim was simply try to see if we can accelerate further had nothing to do with that. I think the time frame and how much time of exposure was the question, how fast they can separate. They need a very extreme rapid separation. ***But the truth is that we know what will happens between 6 months and 1 year of exposure, we already have that data and we present it to people. So we feel really comfortable that this is going to be a successful product.***
>
> ***The question is how fast we can accelerate.*** Remember, it was originally a 2-year type design, and we've been pulling it up. ***So it's really more about -- not about PTS, it's about how fast we can get to the success point.***
>
> ***So we feel very comfortable that either the mid or the end of the year, we'll be hitting the trial. We know the drug works very well. And so we're confident in it.***
>
> **February 13, 2025, Earnings Call**

115. On February 13, 2025, the Company held an earnings call to discuss its financial results for the fiscal quarter and full year ended on December 31, 2024 ("Q4 2024 Earnings Call").

116. During the Q4 2024 Earnings Call, an analyst from TD Cowen, Yaron Benjamin Werber ("Werber"), first asked whether the Orbit study was "stratifying . . . Type I, III, and IV between the two arms?" Defendant Kakkis responded by stating:

*Werber* - Right. So I also, shockingly, have a 143 question. In the Orbit study, are you stratifying, just remind us, Type I, III and IV between the two arms? And then secondly, when you look at the primary of fracture rates, do you have a secondary looking fracture rates by type, underlying type?

*Defendant Kakkis* - Yes. So in general, we do stratify, but it's mainly for -- it's overall fractures and its age. I'll let Eric talk about the way we're approaching.

*Defendant Crombez* -Yes. So because the primary endpoint is annualized fracture rate, you want to stratify by fracture rate. So while that definitely will kind of encompass the different types there, the strict stratification is based on fracture rate coming into the study.

*Defendant Kakkis* - **So Type [ III and IVs ] may have a higher fracture, but we're focusing on that -- doing it by the IIIs and IVs and Is, it didn't look like that was going to be the right way to go, as fracture rate was a better way.** So we are also looking at ages so there's an age balance between the groups. And regarding the other endpoints, **we are looking at total fractures, not just the fractures minus fingers, toes, skull. Those total fractures are our endpoint.** And the subset between subtypes, I'm sure we'll do analysis sensitivities on that in there, but it's not a formal secondary endpoint.

117. As the Q4 2024 Earnings Call continued, questions were asked about the Phase II Orbit data at 6 months and at 14 months, and whether the Phase II Orbit study would have met the criteria for the second interim analysis. In response, Defendant Kakkis emphasized that the results of the Phase II Orbit study could reasonably explain the ongoing results of the Phase III Orbit study:

*Jeff Hung* - I just wanted to clarify, make sure I understood correctly. You talked about how the Phase II data and the 0.014. But just for setrusumab, would the Orbit Phase II portion have hit with the second interim analysis criteria, and if not, how were the baseline fracture rates different from the Phase II portion?

Verified Shareholder Derivative Complaint

Yes. So what I said was the Phase II data at 6 months, last patient in, we had 0.04, and then with the 14-month data we had 0.0014, right? So that was the difference. You're asking how close does that reflect what's going on? *Well, the Phase II patients are fairly similar in terms of the entry criteria for fractures are the same.* They're made up of Type Is, IIIs, 4. *Their Phase III has somewhat more 3s and IVs, but not a dramatic difference. So it's a very comparable population, age range, types included and baseline fracture requirements. So I think that those are reasonable ways to look at what Phase III should be happening.* And so the only question has to do with how -- the variation in the population, how big is it and how much it moves in the timeframe. But I think the data from Phase II are a reasonable model for what's happening. Is that helpful?

118. During the Q4 2024 Earnings Call, questions were asked about the Phase III OI Studies' abilities to meet the second interim criteria, specifically what reasons or risk would contribute to the inability to reaching the criteria. In his response, Defendant Kakkis, minimized potential risks and the probability that the studies would not meet the criteria. In particular, he stated the following:

*Richter* - Maybe help us understand, if it doesn't hit on the second interim, what would those reasons be, or what are the risks to that? And then how long would we have to wait for the final analysis?

*Defendant Kakkis* - Well, we said the second interim will be midyear. *For it not to hit at 12 months, it's usually in rare disease it would have to do with the amount of variation and the number of fractures.* If there's a lot of variation, there's a wide range of patient baseline fracture rates because we have some Type III, IV and then Type I patients. A large variation could create some -- a challenge. *But I think that so far, we feel like the trial is proceeding as expected.* So if it doesn't hit in the second interim, we'd expect to release data by the end of the year on the final assessment for the trial.

119. Moreover, during the Q4 2024 Earnings Call, Joon So Lee, the Vice President of Truist Securities, Inc. asked, "[i]f the OI study goes to completion in 4Q, does that imply that the magnitude of effect may not be as great as expected?" and if that situation occurred, "how competitive would setrusumab be compared to bisphosphonate?" Defendant Kakkis responded by assuring investors that even if the Phase III OI studies continued past the

second interim analysis, the clinical prospects of setrusumab would remain the same. Defendant Kakkis stated the following:

> Actually, it would not mean it's not as great. If you remember, earlier when we had 6-month data and 14 months in Phase II, they both had 67% reduction in fractures. What it has to do with is the two lines have to separate. So the biggest [ creation ] if there's too much variation and those variations might cause a delay. But the actual rate separation could very well be 67%. ***It's just you have a lot of patients that may have 10 fractures a year or one fracture a year in the same study, and some of the ones may not have fractured, for example, and then -- for whatever reason. And so it's really more about separating the two groups.*** But I don't think it necessarily tells you what the percent reduction is.

> We think if you listen to some of the KOLs, that 50% or greater reduction in fracture is considered really important. ***And frankly, when we look at patients after a year, 15, 16 months of therapy, we've had some -- or longer -- many of them are not fracturing at all at some point. So we feel very comfortable that the long-term outcome here is greatly reduced fractures***, whatever the number is. But I think the biggest issue is the variation in how much fractures are occurring in each group and that wide range that probably exists that will impact how the study reads out. ***We are using covariables to manage that variation, but that would be the #1 reason. So I don't think you can conclude the drug is not working well if we go to the end***.

> Remember, the original plan here was to do a 2-year study. ***The only reason we felt we could go sooner is because the percent reduction was higher than we thought and that the speed of response was faster.*** Those are the things that give us confidence that we can go earlier. But we've been moving this up from 18 months to 2-year study, right, down to what we're talking about now to the 12- to 18-month time frame. ***So 18 months is still a win, and I feel confident, whichever one happens, that we have a drug that will be far better than bisphosphonate and certainly the best treatment for OI that's available.***

***March 28, 2025, Proxy Statement***

120. On March 28, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch solicited the 2025 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

51

Verified Shareholder Derivative Complaint

121. The 2025 Proxy Statement called for the Company's shareholders to, *inter alia*: (1) to re-elect Defendants Fust and Ray; (2) approve the Second Amended and Restated 2023 Incentive Plan ("2025 Amendment to the 2023 Plan"); (3) ratify the selection of Ernst & Young LLP as the Company's independent accounting firm for the year needed on December 31, 2025; and (4) approve, on an advisory basis, the compensation of the Company's named executive officers.

122. The 2025 Proxy Statement notes that, if approved, the 2025 Amendment to the 2023 Plan would cause 3,000,000 shares of common stock to be made available for issuance under the plan. The 2025 Amendment to the 2023 Plan would also extend the term of the plan through May 15, 2035. Per the 2025 Proxy statement as of March 7, 2025, the total remaining shares for issuance was 2,693,911, meaning that if the 2025 Amendment to the 2023 Plan is approved, there would be a total of 5,693,911 shares available for grant. The 2025 Proxy Statement states that employees, executives, and directors are eligible to participate under the 2025 Amendment to the 2023 Plan. The 2025 Proxy statement further states that if the 2025 Amendment to the 2023 Plan is not approved it would limit the Company's "ability to attract and retain talented employees and other services providers."

123. Regarding the "Role of the Board in Risk Oversight," the 2025 Proxy statement states:

> The Board has overall responsibility for the oversight of our risk management process, which is designed to support the achievement of organizational objectives, including strategic objectives, to improve long-term organizational performance, and enhance stockholder value. Risk management includes not only understanding company-specific risks and the steps management implements to manage those risks, but also assessing what level of risk is acceptable and appropriate for us, taking into account the immediacy of any such risks, and evaluating risks and circumstances across various timeframes, including the short, medium and long term. Management is responsible for establishing our business strategy, identifying and assessing the related risks, and implementing appropriate risk management practices. The Board periodically reviews our business strategy and management's assessment of the related risk and discusses with management the appropriate

52

Verified Shareholder Derivative Complaint

level of risk for us. The Board also periodically evaluates and discusses potential emerging risks with members of senior management as well as third-party advisors and experts. In 2024, the Board and the committees, as appropriate, reviewed with management the various risks and mitigation strategies related to cost containment strategies, prioritization of the Company's pipeline programs, cybersecurity risks and the Company's initiatives related to our Impact Report. The Board also delegates to Board committees oversight of selected elements of risk as set forth below.

124. Regarding the Company's Code of Conduct, the 2025 Proxy Statement provides the following:

We have adopted a Global Code of Conduct that applies to all of our employees, officers, and directors, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. Our Global Code of Conduct is available on our website, *www.ultragenyx.com,* under the "Corporate Governance" subsection of the "Investors" tab. We intend to promptly disclose on our website any future changes or amendments to, or waivers of, to the Global Code of Conduct that we are required to disclose under applicable rules. Our Board is responsible for applying and interpreting the Global Code of Conduct in situations where questions are presented to it.

125. Regarding the Company's Audit Committee, the 2025 Proxy Statement state the responsibilities of the Audit Committee as:

•Appoints, approves the compensation of, reviews the performance of, and assesses the independence of our independent registered public accounting firm

•Approves audit and permissible non-audit services, and the terms of such services, to be provided by our independent registered public accounting firm

•Reviews the audit plan with the independent registered public accounting firm and members of management responsible for preparing our financial statements

•Reviews and discusses with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures and critical accounting policies

•Discusses with management, and as applicable, the independent auditor, disclosure controls and procedures over environmental and sustainability reporting data and disclosures

Verified Shareholder Derivative Complaint

•Reviews the adequacy of our internal control over financial reporting; establishes policies and procedures for the receipt and retention of accounting-related complaints and concerns

•Recommends whether our audited financial statements shall be included in our annual reports on Form 10-K

•Prepares the audit committee report to be included in our annual proxy statements

•Reviews all related-person transactions

•Reviews policies related to financial risk assessment and management

•Establishes, maintains, and oversees our Global Code of Conduct

•Assists the Nominating and Corporate Governance Committee by overseeing our compliance program with respect to legal and regulatory requirements impacting areas of financial risk

•Annually reviews and reassesses the adequacy of the Audit Committee charter and performs other duties, as specified in the charter

126. Regarding the Company's Research and Development Committee, the 2025 Proxy Statement stated the responsibilities of the Research and Development Committee as:

•Evaluates and advises on our key R&D activities and early pipeline development goals and strategy

•Evaluates and provides input with respect to the quality of the science being conducted and overall program execution

•Assesses the overall quality of the R&D programs and prospects for progression to monitor our pipeline to maintain product flow

•Evaluate and advise on our clinical-stage pipeline and the development strategies

•Performs other duties as specified in the Research and Development Committee Charter

127. Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate

to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

128. The 2025 Proxy Statement also failed to disclose, *inter alia*, that (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's description of the Board's and its committees' oversight functions, neither the Board nor its committees were adequately exercising their functions and were causing or permitting the Company to issue false and misleading statements.

129. As a result of Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Fust and Ray, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve the 2025 Amendment to the 2023 Plan to, among other things, increase the number of shares reserved for issuance by 3,000,000 shares; (3) ratify the selection of Ernst & Young LLP as the Company's independent accounting firm for the year ended on December 31, 2025; and (4) approve, on an advisory basis, the compensation of the Company's named executive officers.

130. As a result of shareholders approving the 2025 Amendment to the 2023 Plan, the plan took effect immediately upon reaching shareholder approval on May 15, 2025. Additionally, there were an additional 3,000,000 shares made available for issuance under the 2025 Amendment to the 2023 Plan. The Individual Defendants, many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the 2025 Amendment to the 2023 Plan.

Moreover, certain Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2025 Amendment to the 2023 Plan in the future.

### May 6, 2025, Earnings Call

131. On May 6, 2025, the Company held an earnings call to discuss its financial results for the quarter ended on March 31, 2025 ("Q1 2025 Earnings Call").

132. During the Q1 2025 Earnings Call, Defendant Crombez stated:

> The Orbit and Cosmic studies will both have an interim analysis midyear after all patients have been on therapy for at least 12 months. The data readouts will be led by Orbit, meaning that if Orbit clears the p-value threshold of less than 0.01, we will look to see if Cosmic has cleared the same p-value threshold of less than 0.01. If Orbit progresses to full study completion in the fourth quarter of this year, Cosmic will also continue to a data readout to align with the Orbit data readout without spending alpha at this interim assessment.

133. During the Q1 2025 Earnings Call, Defendant Kakkis was asked to elaborate on the likelihood of success if the Phase III studies failed to meet the second interim analysis criteria and the studies moved to a third and final analysis. Defendant Kakkis responded by assuring investors that even if the Phase III OI Studies failed to meet the second interim analysis, the Phase III OI Studies would still achieve successful results. In particular, Defendant Kakkis stated the following:

> *Tazeen Ahmad* - . . . if the study moves to a third interim read, what's your view of the likelihood of success? You've talked now multiple times about confidence in the molecule overall, and we would agree that the drug is active. But if the study moves to the third interim, what would be a reason to be concerned that it would not work at the third interim?

> *Defendant Kakkis* - Right. Well, it won't be -- the next assessment is the final assessment for the study, and that p-value threshold will be 0.04. So it would be a lot easier to hit 0.04. ***So we think that we will hit one or the other based on our experience, what we've seen. I don't think we could miss the 0.04 at that point with 18 months of time.*** But as always in rare disease programs, the other -- the thing you always are battling us is variation, variability in patients. ***But based on the profound difference in bone mineral density***

*change that we see that happens within 2 to 3 months and the fracture rate effect happens within 2 to 3 months, we feel pretty good about IA2 hitting, but confident about overall the study hitting even at the end, if not at the IA2.*

So I can't tell you a reason why, but variation is always the thing that can create complexities. But given that the patients -- *the program is 159 patients, that's a pretty large study. And we were -- the data we're talking about before was 24. So I think we've got a lot of power in there, but -- and we've done everything we can to manage variations. So I feel good about we'll hit it this year, either at 0.01 or 0.04 after 18 months.*

134.   During the Q1 2025 Earnings Call, Defendant Kakkis was asked to comment on the difference between the distribution of the OI types in the Phase II Orbit study and the Phase III Orbit study. Defendant Kakkis responded with the following:

*Yigal Dov Nochomovitz* - Have you commented at all on the distribution of the types for OI for 1, 3 and 4 for the Phase II versus the Orbit trial?

* * *

So on the OI types, I think we've disclosed before that in the *Phase II study, there were 7 type 3s and 4s and 17 type 1s.* And then because the doctors were then impressed with the results, then they were interested in bringing in their more severe 3 and 4 patients. *So we ended up with more type 3s and about half the patients are type 3 and 4 approximately there in the study. So it's definitely an increase in Type 3s and 4s in the Phase III study than they were in the Phase II study, all right?*

135.   Defendant Kakkis further responded to questions on whether setrusumab's benefits OI type 1 patients more than OI type 3 or 4 patients. Defendant Kakkis responded by creating a false impression that he was in possession of reliable information that supported his confidence in setrusumab's efficacy regardless of OI type. Defendant Kakkis stated the following:

*Mahdi Goudarzi* - This is Mahdi on for Joon. So I go on OI and follow up Yigal's question on composition of OI types. So do you agree that setrusumab's MOA benefits the type 1 patients more than Type 4 and 3. This is the question.

*Defendant Kakkis* - *Well, I know there's been some academics saying that,* but -- and I know some of them very good academics, *but they're actually*

57

Verified Shareholder Derivative Complaint

*incorrect because we already have data.* So it's not -- the theory would be that in type 1 patients have deficient collagen, don't have abnormal collagen. *Therefore, if we just make more bone, it will be okay.* And the type 3s and 4s have abnormal collagen, therefore, it's not improved, but that's not actually what we saw. We see both of them have improved reduction in fractures. And in fact, the ones fractures we did see were in type 1 patients, I think were some of the ones not type 3s and 4s.

So the truth is all of them are improved because while one is a deficiency collagen and one is abnormal collagen, whether deficient or abnormal, the net benefit of making more bone is bone, greater bone strength and reduced fractures. So it actually works in all three. *And historical clinical view of OI is going to change because the truth is that even with abnormal collagen, the bones can be strengthened,* we believe, in these patients, and that's what we've seen, and that's in the data from Phase II. *And so we're confident that the type will not matter.* You get the same bone mineral density effect and the strength improvement will be the same regardless of the collagen mutation.

136. The statements in ¶¶75-81, 94-119, 131-135 above were materially false and misleading and failed to disclose, inter alia, that: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE AS FALSE AND MISLEADING STATEMENTS CONTINUE

*July 9, 2025, Press Release*

137. The truth began to emerge on July 9, 2025, when the Company published a press release ("July 2025 Press Release") and announcing "that the randomized, placebo-controlled Phase 3 portion of the *Orbit* study evaluating UX143 (setrusumab) in pediatric and young adult patients with osteogenesis imperfecta (OI) is progressing toward a final analysis consistent with the original plan, around the end of the year."

138. Contrary to previous statements made about the potential for success in meeting the second interim analysis, the July 2025 Press Release stated that:

Patients will continue dosing in the ongoing Phase 3 *Orbit* and *Cosmic* clinical studies with the final analyses to be conducted after patients have been on therapy for at least 18-months. The threshold for the Phase 3 *Orbit* final analysis is p<0.04 and for the Phase 3 *Cosmic* final analysis is p<0.05.

139. On this news, the price of the Company's stock fell $10.41 or 25.1%, from a closing price of $41.44 per share on July 9, 2025, to a closing price of $31.03 per share on July 10, 2025. However, the Individual Defendants continued to obfuscate the truth regarding setrusumab's viability as a drug candidate.

**August 5, 2025, Press Release and Earnings Call**

140. On August 5, 2025, the Company published a press release announcing its financial results for the quarter ended on June 30, 2025 ("Q2 2025 Press Release"). The Q2 2025 Press Release provided an update on the Company's ongoing studies under the heading "Corporate Update."

141. Specifically, the Q2 2025 Press Release stated that:

The randomized, placebo-controlled Phase 3 portion of the *Orbit* study was evaluated by the Data Monitoring Committee at an interim analysis in July 2025 and they informed the company that UX143 demonstrated an acceptable safety profile and that the study should continue to the final analysis.

142. On the same day, the Company also held an earnings call to discuss its financial results for the aforementioned period ("Q2 2025 Earnings Call").

143. During the Q2 2025 Earnings Call Defendant Kakkis assured the investing public in his confidence in setrusumab's efficacy and the success of the Phase III studies. Specifically, Defendant Kakkis stated that:

*The Orbit and Cosmic studies are continuing to the final analysis that will occur around the end of the year.* While I hope the studies might have stopped early at the interim time point last month, *we remain confident in*

59
Verified Shareholder Derivative Complaint

*completing a successful study.* We're pleased the safety profile is as expected and that after looking at the data, the DMC recommended we continue to the final analysis. *As we head to the final analysis, the continued treatment of Phase III should further strengthen bones of the treated patients. The additional 6 months of treatment for the treated subjects, along with the larger p-value threshold at 0.04, will help power the final assessment.* We look forward to unblinding the Phase III datasets and sharing results around the end of the year.

Now based on all the data we've seen in Phase II, *we are confident UX143 will be a transformational treatment for pediatric and adult patients with osteogenesis imperfecta. The combination mechanism of building bone and reducing excess resorption is at exactly the sites in their body where they need more bone will increase bone strength and reduce fractures, while at the same time improving overall bone health.* In addition to reducing fractures, we are encouraged by the functional effect we are seeing on increasing physical activity and ability that speaks to the long-term potential for this treatment.

144. During the question-and-answer portion of the Q2 2025 Earnings Call, a question was asked about whether the U.S. Food & Drug Administration would approve the treatment in the case that the fracture data falls under what was expected. In response, Defendant Kakkis assured investors that:

*Kluska* - For the Orbit study reading out later this year, I know you still have very high conviction in the trial being successful. But I wanted to talk about a hypothetical scenario where maybe the fracture data falls slightly under what you were hoping for, but you see really strong benefits on pain. Do you still think that there is a strong case to make for the FDA here? And could you argue that this will drive higher adoption for patients since they deal with this on a daily basis over the fracture aspects?

*Defendant Kakkis* - Well, I think that your point is maybe there's some variation in fractures and you just missed that and you have other supportive data. I think the FDA will always look at the total -- totality of the data in our rare disease program. We've had that many times in many programs. *Our sense here is that we're seeing a fundamental mechanistic effect on bone mineral density, the effect it has on fractures depends on how many fractures that patient have in their particular condition.*

*We have a lot more Type IIIs and Type IVs in the study. They have a lot of complex problems.* And so I'm sure that the support of other data would help

Verified Shareholder Derivative Complaint

us in any situation, whatever the statistical or treatment size is. And so that's just generally been the case. ***We feel confident what the fracture data will be, what it is. We're seeing what's going on in Phase II. We know that as time goes on, there's very few fractures among patients after they've gotten established on the treatment.***

So we feel good we'll be able to do that. But hypothetically, I think the data will always be more than just fractures in this disease state. And the body of data we have, we think, will support its use however we come out with on fractures.

145.   As the Q2 2025 Earnings Call continued, analysts asked for comment on what the Individual Defendants believed would be the most likely scenario regarding the expected placebo annualized fracture rate, now that the Phase III OI Studies did not meet the second interim analysis criteria. In response Defendant Crombez stated that:

*Yigal Dov Nochomovitz* - Okay. I was going to say on OI, given the first 2 interims have passed and now we're looking at the final one, I'm just curious if you have any updated thoughts as far as what you believe the expected placebo AFR would be. Obviously, we've done some work, and there are a number of epidemiologic studies out there, both in Scandinavia as well as the United States, which point to various ranges for AFR.

I'm just wondering if you could comment on what you believe would be the most likely scenario at this point as well as on some of the more specific aspects of the statistics again regarding this concept of variance or overdispersion which, as we know, is a feature of this particular dataset given the way the fractures are distributed.

*Defendant Crombez* - Yes. So yes, we're aware of the annualized fracture rate available in the literature. And looking at natural history the principal investigators have on hand, we really use a lot of the data coming on for pretreatment for baseline for both Orbit and Cosmic to do our modeling. ***And we were really looking at those patients with the baseline AFR between 0.72 and 1 for our modeling to support both of the work for the interim analysis and obviously, the powering we did for the primary efficacy analysis period at 18 months.***

And with the dispersion, yes, I mean, I think while we did not change the entry criteria for Orbit Phase II going into Orbit Phase III, on the strength of the Phase II data, ***we had really what I consider to be a self-enrichment of patients with Type IIIs and Types IV. I think they needed to see that strong safety and efficacy data to take the risk to come into clinic because***

Verified Shareholder Derivative Complaint

*remember, they really are at risk just from traveling into sites to sign consents and begin studying participation. So I will say we did -- we have a greater number of patients with Type III and Type IV OI in the Phase III part of Orbit compared to Phase II.*

*November 4 2025, Earnings Call*

146. On November 4, 2025, the Company held an earnings call to discuss its financial results for the period ended on September 30, 2025 ("Q3 2025 Earnings Call").

147. Defendant Kakkis continued to emphasize his confidence in the setrusumab and particularly the Phase III OI Studies' ability to show a reduction in the annualized fracture rate. Specifically, during the Q3 2025 Earnings Call, Defendant Kakkis stated the following:

As we move into the final analyses, we remain confident in setrusumab's mechanism of action, its ability to make more bone in the places that need more strength, which should reduce fractures. If successful, this will lead to a transformational treatment for pediatric and adult patients with osteogenesis imperfecta.

\*\*\*

Now with regard to what we expect in Phase III, *we've said that anywhere between 40% and 70% reduction in fractures, in that range, is a very good fracture reduction level. And I don't think that the exact percentage within that range matters as much as how patients feel and how they're functioning.* And from the Phase II study, it's pretty clear that the way patients are functioning is quite important in terms of their ability to take on exercises, to walk better, get out of wheelchairs or using walkers, et cetera.

*So we think anywhere in that range -- and I think most KOLs have suggested something better than 40%.* We've seen 67% in the Phase II study. I think anywhere in that range is -- I think, would be a clinically meaningful change for these patients.

\*\*\*

So I think if we get one or the other study positive, we'll be able to work forward. And how we solve the issue of the age range and the indication, *I don't expect there to be a difference in how the drug works. I think both*

62

Verified Shareholder Derivative Complaint

*studies should show a substantial bone mineral density benefit improvement and should show improvement in fractures.* So we're confident in the program, but I think we can make it work with either combination of results.

148. The statements in ¶¶140-147 above were materially false and misleading and failed to disclose, inter alia, that: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

149. The truth fully emerged on December 29, 2025, when the Company filed a Form 8-K with the SEC ("December 2025 8-K") announcing the "results from the Phase 3 Orbit and Cosmic Studies for setrusumab (UX143) in Osteogenesis Imperfecta."

150. The December 2025 8-K disclosed that the Phase III OI Studies failed to achieve a statistical significance "against the primary endpoints of reduction in annualized clinical fracture rate compared to placebo or bisphosphonates," although it had met the "secondary endpoints of improvements in bone mineral density ('BMD')."

151. The December 2025 8-K included the following details of the results of the Phase III studies:

In the Orbit study, participants experienced statistically significant and substantial improvements in BMD compared to placebo, at levels consistent with the treatment effect observed in the Phase 2 portion of the study. *These BMD changes were not accompanied by a corresponding reduction in annualized fracture rates and there was a low fracture rate in the placebo group.*

In the pediatric Cosmic study*, patients had a substantially higher baseline fracture rate compared to the patients enrolled in Orbit*. In this younger patient population, meaningful improvements in BMD were *associated with*

63

Verified Shareholder Derivative Complaint

*a reduction* in annualized fracture rate for setrusumab treated patients compared to bisphosphonate treated patients, though *the reduction did not meet statistical significance.*

152. Moreover, the December 2025 8-K further disclosed that the Company "is evaluating its planned operations and *will promptly define and implement significant expense reductions*[.]"

153. On this news, the price of the Company's common stock per share dropped $14.47 or approximately 42.3%, from a closing price of $34.19 per share on December 26, 2025, to a closing price of $19.72 per share on December 29, 2025.

## DAMAGES TO ULTRAGENYX

154. As a direct and proximate result of the Individual Defendants' conduct, Ultragenyx has lost and will continue to lose and expend many millions of dollars.

155. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

156. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

158. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

159. As a direct and proximate result of the Individual Defendants' conduct,

Verified Shareholder Derivative Complaint

Ultragenyx has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

160.    Plaintiff brings this action derivatively and for the benefit of Ultragenyx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ultragenyx, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

161.    Ultragenyx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

162.    Plaintiff is, and has been at all relevant times, a shareholder of Ultragenyx. Plaintiff will adequately and fairly represent the interests of Ultragenyx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

163.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

164.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Ultragenyx's Board consisted of the following eight individuals: Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

165.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to

65

Verified Shareholder Derivative Complaint

make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

166. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Ultragenyx to issue materially false and misleading statements. Specifically, the Director-Defendants caused Ultragenyx to issue false and misleading statements which were intended to make Ultragenyx appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

167. In addition, the Director-Defendant caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Amendment of the 2023 Plan, thereby increasing the number of shares available for issuance thereunder by 4,000,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Amendment of the 2023 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Amendment of the 2023 Plan at the annual meeting of the stockholders on June 18, 2024, there were 952,800 shares available for issuance under the 2023 Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the 2024 Proxy Statement and the shareholders approving the 2024 Amendment of the 2023 Plan that made an additional 4,000,000 shares available under the Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

168. In addition, the Director-Defendant caused the 2025 Proxy Statement to call for a shareholder vote to approve the 2025 Amendment of the 2023 Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares. The

Verified Shareholder Derivative Complaint

misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment of the 2023 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Amendment of the 2023 Plan at the annual meeting of the stockholders on May 15, 2025, there were 2,693,911 shares available for issuance under the 2023 Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the 2025 Proxy Statement and the shareholders approving the 2025 Amendment of the 2023 Plan that made an additional 3,000,000 shares available under the Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

169. Additional reasons that demand on Defendant Kakkis is futile follow. Defendant Kakkis founded Ultragenyx in April 2010 and has served as the Company's President, CEO and as a Company director since April 2010. As such, the Company provides Defendant Kakkis with his principal occupation for which he received lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Additionally, Defendant Kakkis solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Kakkis also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the

Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Furthermore, Defendant Kakkis is a defendant in the Securities Class Action which has brought reputational and financial damage to the Company. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Kakkis is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Kakkis breached his fiduciary duties, faces as substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

170. Additional reasons that demand on Defendant Dunsire is futile follow. Defendant Dunsire has served as a Company director since April 2017. She also serves on the Compensation Committee and the Research and Development Committee. Defendant Dunsire has received sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Dunsire solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect herself and Defendants Narachi and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Dunsire also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company,

and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Dunsire is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Dunsire breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

171. Additional reasons that demand on Defendant Fust is futile follow. Defendant Fust has served as a Company director since January 2014. He also serves as the a member of the Nominating and Corporate Governance Committee and as the Audit Committee Chair. Defendant Fust has received and continues to receive sizeable compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Fust solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Fust also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect himself and Defendant Ray to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Fust is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Fust breached his fiduciary duties, faces a

Verified Shareholder Derivative Complaint

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

172. Additional reasons that demand on Defendant Narachi is futile follow. Defendant Narachi has served as a Company director since February 2015. He also serves on the Audit Committee and as Chair of the Compensation Committee. Defendant Narachi has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted, little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Narachi solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect himself and Defendants Dunsire and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Narachi also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Narachi is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Narachi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173. Additional reasons that demand on Defendant Ray is futile follow. Defendant Ray has served as a Company director since April 2022. He also serves as the Chair of the Research and Development Committee. Defendant Ray has received and continues to

70

Verified Shareholder Derivative Complaint

received significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Ray solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Ray also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect himself and Defendant Fust to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Ray is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Ray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174. Additional reasons that demand on Defendant Sanders is futile follow. Defendant Sanders has served as a Company directors since June 2021. She also serves on the Audit Committee and the Research and Development Committee. Defendant Sanders has received and continues to receive sizable compensation for her role as a director. As a trusted Company director, she, conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additional reasons that demand on Defendant Narachi is futile follow. Defendant Narachi has served as a Company director

since February 2015. He also serves on the Audit Committee and as Chair of the Compensation Committee. Defendant Narachi has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted, little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Sanders solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect himself and Defendants Dunsire and Narachi, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Sanders also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Sanders is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Narachi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Sanders breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

175. Additional reasons that demand on Defendant Suliman is futile follow. Defendant Suliman has served as a Company director since February 2019. She also serves

Verified Shareholder Derivative Complaint

on the Research and Development Committee and as Chair of the Nominating and Corporate Governance Committee. Defendant Suliman has received and continues to receive sizable compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Suliman solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Suliman also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Suliman is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Suliman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

176. Additional reasons demand on Defendant Welch is futile follow. Defendant Welch has served as a Company director since April 2015. He also serves on the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Welch has received and continues to receive sizable compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the

73

Verified Shareholder Derivative Complaint

scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Welch solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2024 Amendment to the 2023 Plan. Defendant Welch also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the 2025 Amendment to the 2023 Plan. Moreover, under the 2024 and 2025 Amendments to the 2023 Plan, Defendant Welch is eligible to receive stock awards under the 2024 and 2025 Amendments to the 2023 Plan, thereby materially benefitting from the adoption of the 2024 and 2025 Amendments to the 2023 Plan. For these reasons, Defendant Welch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177. Additional reasons that demand on the Board is futile follow.

178. Defendants Fust (as Chair), Narachi, and Sanders (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code

74

Verified Shareholder Derivative Complaint

of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

179. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and/or cause the Company to make materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is futile as to them.

180. Ultragenyx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Ultragenyx any part of the damages Ultragenyx suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

181. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of

the Company. Accordingly, demand is excused as being futile.

182. The acts complained of herein constitute violations of fiduciary duties owed by Ultragenyx's officers and directors, and these acts are incapable of ratification.

183. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ultragenyx. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Ultragenyx, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

184. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Ultragenyx to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

185. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch for Violations of**

## Section 14(a) of the Exchange Act

186. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

189. Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch caused the 2024 and 2025 Proxy Statements, to be false and misleading by failing to disclose, *inter alia*: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

190. Under the direction and watch of Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch, the 2024 and 2025 Proxy Statements also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered

to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 and 2025 Proxy Statements' description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

191. In the exercise of reasonable care, Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 and 2025 Proxy Statements, including, but not limited to, the reelection of the Company's directors and the approval of the 2024 and 2025 Amendments to the 2023 Plan.

192. As a result of Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Dunsire, Narachi, and Sanders to the Board, thereby allowing them to continue breaching their fiduciary duties; (2) approve the 2024 Amendment to the 2023 Plan, which allowed for the addition of 4,000,000 shares available for grant; (3) ratify the selection Ernst & Young LLP as the Company's independent accounting firm for the years ended on December 21, 2024; and (4) approve, on an advisory basis, the compensation of the Company's named executive officers.

193. As a result of Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Fust and Ray to the Board, thereby allowing them to continue breaching their fiduciary duties; (2) approve the 2025 Amendment to the 2023 Plan, which allowed for the addition of 3,000,000 shares

Verified Shareholder Derivative Complaint

available for grant; (3) ratify the selection Ernst & Young LLP as the Company's independent accounting firm for the years ended on December 21, 2024; and (4) approve, on an advisory basis, the compensation of the Company's named executive officers.

194. The Company was damaged as a result of Defendants Kakkis, Dunsire, Fust, Narachi, Ray, Sanders, Suliman, and Welch's material misrepresentations and omissions in the 2024 and 2025 Proxy Statements.

195. Plaintiff, on behalf of Ultragenyx, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

196. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ultragenyx's business and affairs.

198. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

199. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ultragenyx.

200. In breach of their fiduciary duties owed to Ultragenyx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) the inherent risks in the methodology of the Phase III Orbit and Cosmic studies; (2) setrusumab's ability increase material bone density did not necessarily correlate to a reduction in annualized fracture rates of OI patients; (3) therefore, setrusumab was less effective than claimed; (4) as a result of the foregoing, the clinical and commercial

Verified Shareholder Derivative Complaint

prospects of setrusumab were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

201. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

202. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

203. In yet further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $9.1 million.

204. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ultragenyx's securities.

205. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper

Verified Shareholder Derivative Complaint

conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ultragenyx's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

206. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ultragenyx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208. Plaintiff, on behalf of Ultragenyx, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

209. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ultragenyx.

211. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Ultragenyx that was tied to the performance or artificially inflated valuation of Ultragenyx, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

212. Plaintiff, as a shareholder and a representative of Ultragenyx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other

Verified Shareholder Derivative Complaint

compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

213. Plaintiff, on behalf of Ultragenyx, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

214. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ultragenyx, for which they are legally responsible.

216. As a direct and proximate result of the Individual Defendants' abuse of control, Ultragenyx has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

217. Plaintiff, on behalf of Ultragenyx, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

218. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ultragenyx in a manner consistent with the operations of a publicly held corporation.

220. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ultragenyx has sustained and will continue to sustain significant damages.

221. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

Verified Shareholder Derivative Complaint

222. Plaintiff, on behalf of Ultragenyx, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

223. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

225. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Ultragenyx to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

226. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

227. Plaintiff, on behalf of Ultragenyx, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Kakkis and Crombez for Contribution Under Sections 10(b) and 21D of the Exchange Act

228. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229. Ultragenyx and Defendants Kakkis and Crombez are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kakkis' and Crombez's willful and/or reckless

Verified Shareholder Derivative Complaint

violations of their obligations as officers and/or directors of the Company.

230. Defendants Kakkis and Crombez, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

231. Accordingly, Defendants Kakkis and Crombez are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

232. As such, Ultragenyx is entitled to receive all appropriate contribution or indemnification from Defendants Kakkis and Crombez.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Ultragenyx, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ultragenyx;

(c) Determining and awarding to Ultragenyx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Ultragenyx and the Individual Defendants to take all necessary actions to reform and improve Ultragenyx's corporate governance and internal procedures to comply with applicable laws and to protect Ultragenyx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary

to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Ultragenyx to nominate at least four candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Ultragenyx restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 6, 2026                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017

Verified Shareholder Derivative Complaint

Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

Docusign Envelope ID: DB3A6C65-4726-4515-92D1-BC33271B2048

Case 3:26-cv-01098-JSK   Document 15-2   Filed 03/06/26   Page 88 of 88

# **VERIFICATION**

I, Ryan Simutis, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th  day of March 2026.

DocuSigned by:

4EC600DAE04F40C...

Ryan Simutis